980 So.2d 1045 (2008)
In re AMENDED CERTIFICATION OF the NEED FOR ADDITIONAL JUDGES.
No. SC07-2379.
Supreme Court of Florida.
April 15, 2008.
LEWIS, C.J.
This amended opinion is intended to fulfill the constitutional obligation of this Court to determine the need for additional judges in Fiscal Year 2008-2009 and to certify our findings and recommendations *1046 concerning that need to the Legislature.[1] Certification is "the sole mechanism established by our constitution for a systematic and uniform assessment of this need." In re Certification of Need for Additional Judges, 889 So.2d 734, 735 (Fla.2004).

JUDICIAL RESOURCE STUDY
As part of our continuing commitment to refine the judicial workload model for analysis, this Court directed the Florida Supreme Court Commission on Trial Court Performance and Accountability to perform an additional extensive study of the judicial case weights to be utilized and the contribution of magistrates and other hearing officers in the case disposition process in an attempt to consistently and regularly validate our process of certification.[2] In response, the Commission created a Judicial Resource Study Workgroup composed of circuit and county court judges, trial court administrators, general magistrates, and hearing officers to study, evaluate, and make recommendations to this Court with regard to the overall judicial workload.
The primary objectives of the study were to update the existing judicial case weights and establish processing times for cases which involve the services of general magistrates and hearing officers. A secondary objective of the study was to develop a tool to assist judicial leadership in determining the optimal allocation of judicial and supplemental resources. The updating of the judicial case weights on a continuing basis is consistent with the recommendations of the National Center for State Courts, the original consultants in connection with the 1999 case weight development.[3] Since 1999, new laws and statutory requirements have been enacted by the Florida Legislature that require additional time in the judicial processing of cases. Moreover, to our knowledge, this is the first time that any state court has ever attempted to evaluate the impact of the contribution of supplemental hearing officers as part of a judicial workload model. These factors and others have been considered in the Judicial Resource Study Final Report.
At the direction of the Judicial Resource Study Workgroup, a General Magistrate/Hearing Officer Subgroup was also formed to study the workload of magistrates and other hearing officers. That *1047 subgroup was composed of three judges and seven magistrates and hearing officers from across the state. Together, these two studies provide a state-of-the-art evaluation of judicial workload in Florida. These studies were multifaceted and integrated.
First, the Judicial Resource Study Workgroup employed a three-prong approach to analyze judicial case weights: (1) a judicial survey of trial court judges was completed; 466 judges, or fifty-four percent, of the 866 trial court judges available during the study participated; (2) a judicial forum was convened to review and validate the weights; seventy-five judges, or nine percent, of the 866 trial court judges available at that time participated; and (3) a final case weight review was conducted by the Judicial Resource Study Workgroup.[4] In addition to reviewing the twenty-six original case weights established in 1999 and the drug court case weight established in 2003, the Workgroup assigned weights to two new categories of cases that have been designated by the Legislature since 1999, namely, Jimmy Ryce and Parental Notice of Abortion cases.
A number of adjustments were made to the existing case weights as a result of this Judicial Resource Study. At the circuit court level, nine weights increased and ten weights decreased. In county court, four weights increased and four decreased. The study provides exhaustive documentation for each adjustment. Reasons for the various case weight adjustments vary by case type in both circuit and county court divisions.
Some of the justifications for increases and decreases in the case weights provided by the judges in the survey and forum group included but were not limited to increases in post  judgment activity, increases in Nelson[5] hearings, increases in bond reduction hearings, mandatory minimum sentencing requirements, disposition requirements for expanded plea colloquies, civil case complexity, statutory changes, difficulty in seating juries, motion practice, increased numbers of parties, the involvement of magistrates in portions of a case, case-related administration, indigence hearings, requirements associated with cases involving children, increasing complexity of Baker Act and Marchman Act cases, increased staff support, increased supplemental resources, increased use of interpreters for non-English speaking litigants, increased numbers of self-represented litigants, changes to the personal injury protection law, increases in identity theft that impact the intensity of workload associated with that category of cases, increases in construction litigation, and decreases *1048 in proportions of occurrences of trials and other case-related events. These examples illustrate the changing dynamics and complexities associated with the cases filed in Florida's courts.
Of particular interest to this Court is the nature of the workload relationship between judges and general magistrates and hearing officers. To the extent currently possible, this study addressed that question. Specifically, the adjusted and new weights (e.g., Jimmy Ryce and Parental Notice of Abortion cases) incorporate the use of general magistrates and hearing officers in case disposition.
The objectives of the General Magistrate/Hearing Officer Study were to: (1) develop a mechanism to measure the workload of general magistrates, Title IV-D child support hearing officers, and traffic hearing officers; and (2) develop a tool to assist judicial leadership in determining the optimal allocation of supplemental resources. This study created a new model for magistrates and hearing officers by drawing on the original judicial workload model framework developed in 1999 and utilizing the same case types and filing data source.[6] As a result, this Court, the chief judges, and the Trial Court Budget Commission are all now in a better position to evaluate the need for and distribution of general magistrates and hearing officers throughout the state.
Judicial availability to hear and decide cases in the county, circuit, and district courts is essential to fulfilling the guarantee of meaningful and timely access to justice for the people of Florida. It is essential that our courts be open, properly staffed, and operational at all times.
Florida's courts must also be equally accessible to all of our citizens. This includes physical and communication accessibility for persons with disabilities, effective and sustained remedies for individuals with mental illnesses, and legal access for self-represented litigants.
All of these issues are linked to the presence of a sufficient judicial staffing complement at the trial and appellate court levels. It is our judges who help to ensure public safety, protect individual rights and liberties, and safeguard the promises of our democracy by promoting and enforcing constitutional guarantees and the rule of law.
The State Courts System has now completed its effort to update the judicial case weights. As noted, we have also established new case weights for general magistrates and other supplemental hearing officers. These new case weights reflect statutory changes enacted by the Legislature since 1999 and the availability of additional supplemental resources (e.g., general magistrates, case managers, and staff attorneys), both of which impact judicial workload.
The Court has accepted the adjusted case weights as provided in the Judicial Resource Study and applied them in our current certification analysis. In addition, in accordance with the discretion afforded under Rule of Judicial Administration 2.240, we have also applied an additional factor to the judicial net need equation, that being the availability of senior judges to hear and dispose of cases. Although the case-weighted methodology takes into account all supplemental resources that assist judges in disposing of cases, prior to the analysis, it has not previously included *1049 the contribution of senior judges who dispose of cases without the assistance of current county or circuit court judges. In our view, senior judges represent an additional resource that can and must be factored into the total package of available judicial resources and are included in this certification analysis.
The application of the case-weighted methodology in 1999 was the dawn of a new era for the State Courts System. Prior to 1999, the certification process was a blend of statistical data regarding case filings and a review of anecdotal information from the trial and appellate courts. The missing element was the actual time necessary for judges to dispose of cases. By adopting the case-weighting methodology in 1999, Florida became one of a very few states to attempt to employ sophisticated evaluation techniques when analyzing judicial workload. From the outset, our court system has embraced the concept of a case-weighted methodology. We are committed to improving the process and analysis each year. Over the last eight years, we have conducted a continual evaluation of the certification process. It is important to this Court, our judges, and the people of Florida that we employ the appropriate methodology. We believe that ongoing self-analysis enhances the overall validity of the process.
We recognize that the incorporation of senior judge time into the certification process this year is a departure from the previous methodology approach. Clearly, this is a complex issue as the use of senior judges allows for greater operational flexibility in the trial courts. However, we believe that it is a prudent approach given the new judgeships the State Courts System has received the last two fiscal years and the adoption of the adjusted case weights. We intend to carefully consider the impact of our decision in this regard by continuing to consult with the chief judges of the lower courts and requesting that the Commission on Trial Court Performance and Accountability further analyze this change to the certification methodology and advise us accordingly.

TRIAL COURT CERTIFICATION
This Court has examined case filing and disposition data, analyzed various judicial workload indicators, and considered judgeship requests submitted by the lower courts. Further, we have taken into consideration the 114 judgeships that were created by the Florida Legislature during two of the last three fiscal years.
In Fiscal Year 2005-2006, approximately ninety-nine percent of all court filings in Florida were processed in the circuit and county courts. Trial court judges are on the front line in dispensing justice; their work is vital to our citizens and businesses who expect the judicial branch to resolve issues fairly, peaceably, expeditiously, and in a manner that promotes the rule of law. Florida's trial court judges stand as guardians of our constitutional freedoms as they ensure access to the courts, protect vulnerable citizens, and ensure that the courts remain open, operational, and functioning at maximum capacity.
From Fiscal Year 2004-2005 to Fiscal Year 2005-2006, case filings have increased by three percent in circuit court. Felony case filings continue to drive statewide growth, specifically cases involving property crimes and drug crimes. Property crime cases (including burglary, theft, worthless checks, and other felonies) have increased by fourteen percent and drug crimes cases have increased by nine percent since Fiscal Year 2004-2005. In circuit civil, the number of mortgage foreclosures has increased by ninety-seven percent statewide over the last twelve months.
*1050 Also contributing to the rise in circuit court filings is substantial growth in certain family case types. From Fiscal Year 2004-2005 to Fiscal Year 2005-2006, dissolution cases have increased by nine percent and dependency cases, including termination of parental rights, have increased by six percent.
County court filings experienced even greater growth from Fiscal Year 2004-2005 to Fiscal Year 2005-2006, with statewide filings increasing by ten percent (excluding civil traffic infractions). Significant growth was seen particularly in the county criminal division, with overall filings rising by nine percent. Cases involving misdemeanors and municipal ordinances increased by seven percent and eight percent, respectively, from Fiscal Year 2004-2005 to Fiscal Year 2005-2006. In county civil, from Fiscal Year 2004-2005 to Fiscal Year 2005-2006, all case types experienced some level of growth with the exception of replevin actions.
In light of the foregoing considerations, this Court certifies the need for nineteen new circuit court judges for Fiscal Year 2008-2009, distributed as follows:
1. Four additional circuit court judges for the Fifth Judicial Circuit;
2. Three additional circuit court judges for both the First and Ninth Judicial Circuits;
3. Two additional circuit court judges for the following circuits: the Seventh, Tenth, and Fourteenth Judicial Circuits; and
4. One additional circuit court judge for the following circuits: the Sixth, Eighth, and Nineteenth Judicial Circuits.
Further, we certify the need for forty-two new county court judges for Fiscal Year 2008-2009, distributed as follows:
1. Six additional county court judges for Miami-Dade County;
2. Five additional county court judges for both Hillsborough and Palm Beach Counties;
3. Four additional county court judges for Duval County;
4. Three additional county court judges for Broward County;
5. Two additional county court judges for the following counties: Brevard, Lee, and Orange; and
6. One additional county court judge for the following counties: Alachua, Citrus, Collier, Columbia, Highlands, Lake, Manatee, Marion, Pinellas, Polk, St. Lucie, Sarasota, and Volusia.
In addition to these judges we have certified today, we have also specifically reviewed the requests from chief judges to certify three circuit court judges in the Ninth Judicial Circuit; two circuit court judges each in the Fourth, Fifth, Seventh, Eleventh, Thirteenth, Fifteenth, Eighteenth, Nineteenth, and Twentieth Judicial Circuits; one circuit court judge each in the Second, Eighth, Tenth, and Twelfth Judicial Circuits; and one county court judge each in Orange, Osceola, St. Lucie, and Seminole Counties. The Court's decision to include the contributions of senior judges in the workload calculation has reduced the net judicial need to less than 0.5 in each of these circuits.[7] We have determined that in the absence of special circumstances, we must deny these requests.

*1051 DISTRICT COURT OF APPEAL CERTIFICATION
Florida Rule of Judicial Administration 2.240(b)(2) delineates the criteria for certifying the need for additional judges in the district courts of appeal. Based on these criteria, we do not certify the need for any additional district court judges. Our determination is bolstered by the fact that the district courts have not requested the certification of any additional judgeships this year.
The issue of certifying a need to decrease a judicial position for any appellate court is far more complex and requires the concurrence of multiple factors for practical application. The timing of a decision on a need to decrease and the timing of a certification to the Legislature of that need to decrease are impacted by the interrelated nature of Florida's constitutional structure and the participation of our three branches of government in the process. Any decrease in judicial positions must be considered with reference to the end of a term of a judicial position, or a resignation, retirement, or other opening that does not correspond with the end of a term of a judicial position. Evaluation of the need to decrease a judicial position involves the concept of a vacancy and the considerations of the executive branch related thereto. Finally, these issues must be addressed by the Legislature in the context of a certification by this Court with reference to a legislative session for final action.
We now have a confluence of practical factors to certify a need to decrease one judicial position in the Third District Court of Appeal for a position with a term that ends on January 5, 2009. A judicial officer of the Third District Court of Appeal has formally advised that she will not seek retention and will leave her judicial position upon the end of the current term for that position. The chief judge of the Third District Court of Appeal has requested on behalf of that court that this judicial position be decertified upon the end of the current term, when the position becomes vacant. This is based upon a continued downward trend in caseload.
We have continuously reviewed the workload trends for the Third District for the last several years including case filings and weighted judicial workload. We must be careful that any decision to decrease the number of judicial positions be based on a clear trend and not merely a recent fluctuation in volume. Our review indicates that from FY 2002-03 through FY 2006-07, the Third District has had the lowest weighted judicial workload per judge for four of those five years. Further, during that same time period, the Third District has demonstrated a clear trend to have the lowest number of case filings and case filings per judge for all years. We determine that these factors are not mere periodic fluctuations, but represent a clear trend which supports a decrease of one position.
Based upon the request of the chief judge on behalf of that court and our review of the workload data, we agree that there should be a reduction of one judicial position for the Third District Court of Appeal. Further, this confluence of factors allows us to amend our certification opinion at this time because it is necessary to allow the Legislature to consider this action before the executive branch is required to begin a process which may alter the status of this position.[8] Pursuant to our obligation under Article V, Section 9 of the Florida Constitution, we hereby decertify one judgeship for the Third District Court of Appeal upon the vacancy of the judicial position, effective January 5, 2009. *1052 This measure is consistent with our efforts to critically evaluate judicial workload, be accountable for our resources and, at the same time, ensure that the administration of justice proceeds without delay.
Despite significant caseloads, the appellate courts of this State have continued to function effectively through the adoption of innovative case-processing methods, strong staff support and law clerk assistance, and diligent case management. The use of technological advancements has also significantly enhanced the efforts of the appellate courts to operate efficiently. We support the conscientious commitment of our district court of appeal judges to improve court operations, and we urge the Legislature to continue to provide funding for the district courts of appeal to support performance at an optimum level.

CONCLUSION
Florida's judiciary continues to be the finest in the country. Our judges serve a vital role in keeping our courts open and accessible to all. The demands on our judiciary arise from several fronts including sustained growth in caseloads and demands for access. There is also a growing recognition by county officials of the need to build more courtrooms to accommodate the space needs of Florida's trial courts.
This Court extends its appreciation to the members of the judiciary who participated in the Judicial Resource Study survey and forum group. The contributions from those sources as subject matter experts in the area of case processing and disposition were essential to the success of the study. We also thank the members of the Judicial Resource Study Workgroup who worked tirelessly for eighteen months with our staff to ensure that the case weights were updated and verified. Lastly, we offer our thanks to the members of the General Magistrate/Hearing Officer Subgroup and all of the general magistrates and hearing officers who participated in the time study and development of new case weights for general magistrates and other hearing officers. Like the judicial effort in 1999, this was a groundbreaking effort for Florida's judiciary.
The Florida Legislature has been receptive to our requests for new judgeships in recent years, for which we are most appreciative. Those additional judgeships significantly reduced the judicial need that has existed for an extended time and since the development of the case weighting methodology. This amended opinion reflects our commitment to continually monitor and evaluate judicial workload by requiring that the case weights be reviewed every five years and by developing enhanced techniques (e.g., magistrate/hearing officer case weights) that enable us to better understand the complexities of case processing and dispositions in Florida given the variety of resources that are available. Validity of the process must be our top priority.
We recognize that the State of Florida is once again facing revenue issues that may impact the ability to place additional resources into the judicial system. Nevertheless, in accordance with our constitutional obligation, we encourage the Florida Legislature to authorize the judgeships identified in this amended opinion as they are targeted to counties and circuits with sustained growth in judicial workload and unsatisfied needs. We ask the Legislature to accept this amended opinion and give it appropriate consideration.
It is so ordered.
WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Article V, section 9 of the Florida Constitution provides in pertinent part:

Determination of number of judges.  The supreme court shall establish by rule uniform criteria for the determination of the need for additional judges except supreme court justices, the necessity for decreasing the number of judges and for increasing, decreasing or redefining appellate districts and judicial circuits. If the supreme court finds that a need exists for increasing or decreasing the number of judges or increasing, decreasing or redefining appellate districts and judicial circuits, it shall, prior to the next regular session of the legislature, certify to the legislature its findings and recommendations concerning such need.
[2] See Supreme Court of Florida, Commission on Trial Court Performance and Accountability, Judicial Resource Study Final Report, Measuring the Workload of Trial Court Judges, General Magistrates and Hearing Officers (2007), available at http://www.flcourts.org/ gen  public/pubs/committee  reports.shtml.
[3] The report states:

Recommendation 2: The OSCA should plan to conduct a systematic update of the case weights approximately every five years, depending on the judgment of the Court Statistics and Workload Committee. Funding for this should be part of the regular legislative agenda related to the process of certification of the need for new judgeships.
Brian J. Ostrom et al., Florida Delphi-Based Weighted Caseload Project Final Report 75 (2000), available at http://www.floridasupreme court.org/pub  info/highprofile/DelphiFull Report.pdf.
[4] See Supreme Court of Florida, Commission on Trial Court Performance and Accountability, Judicial Resource Study Final Report, Measuring the Workload of Trial Court Judges, General Magistrates and Hearing Officers (2007), available at http://www.flcourts.org/ gen  public/pubs/committee  reports.shtml, for a complete discussion of the methodology used.
[5] Nelson v. State, 274 So.2d 256, 258-59 (Fla. 4th DCA 1973) (where defendant, before commencement of trial, requests discharge of his court-appointed counsel, trial judge should make an inquiry of defendant as to reason for request and, if incompetency of counsel is assigned as reason, should make a sufficient inquiry of defendant and his appointed counsel to determine whether there is cause to believe that counsel is not rendering effective assistance to defendant, and if reasonable cause for such belief appears, trial judge should make a finding to that effect on record and appoint substitute counsel who should be allowed adequate time to prepare defense, but if no reasonable basis for such belief appears, trial judge should so state on record and advise defendant that if he discharges his original counsel the State may not thereafter be required to appoint a substitute).
[6] See Supreme Court of Florida, Commission on Trial Court Performance and Accountability, Judicial Resource Study Final Report, Measuring the Workload of Trial Court Judges, General Magistrates and Hearing Officers (2007) 11, available at http://www.flcourts.org/ gen  public/pubs/committee  reports.shtml.
[7] Total judicial need is the total number of judges required to complete all expected workload. Net judicial need is the difference between the total judicial need and the number of existing judges.
[8] See art. V, § 11(a), Fla. Const.