QUINCE, C.J.
 

 This opinion fulfills the constitutional obligation of this Court to determine the need for additional judges in Fiscal Year 2009-2010 and to certify our findings and recommendations concerning that need to the Legislature.
 
 [1]
 
 Certification is “the sole mechanism established by our constitution for a systematic and uniform assessment of this need.”
 
 In re Certification of Need for Additional Judges,
 
 889 So.2d 734, 735 (Fla.2004).
 

 This Court finds that it must certify to the Legislature the need for additional judgeships. At the same time, this Court is mindful of and concerned by the budget reductions the court system and its justice system partners have sustained over the last year. There is limited value in certifying judicial need when the justice system, including court support staff, supplemental judicial resources, and staffing complements in state attorney and public defender offices, are being reduced to such a degree as to seriously impede the administration of justice in the courts.
 

 This Court acknowledges that our state and our nation are experiencing an unparalleled economic crisis. During these chal
 
 *1178
 
 lenging economic times the Court recognizes that all branches of government must do their share to help balance the state budget, and the judicial branch has participated in that effort. Nonetheless, there comes a time when making necessary adjustments in order to sustain budget reductions cascades into crippling the daily operations of an entire branch of government. Recent action by the Legislature in Special Session A of this year demonstrates to us the Legislature’s acknowledgment of the need to maintain funding for our court system.
 

 In the American system of government, it is the court system that protects rights and liberties, upholds and interprets the law, and provides for the peaceful resolution of disputes. When the adequate funding of the judicial system is compromised, the consequences are tangible and potentially long-lasting. Given the fiscal challenges the state continues to face in funding, this Court has a continuing duty to inform the Legislature on the impact that elimination of court resources has on our citizens, businesses, and the timely administration of justice, even as we make this certification of need.
 

 TRIAL COURTS
 

 Budgetary unification of the trial courts began with an amendment to Article V of the Florida Constitution, approved by the voters in 1998, that required state funding of most court costs. The amendment demanded a greater uniformity of resources across judicial circuits under state funding, which has enhanced the equitable level of trial court services for all Floridians. In 2004, the Legislature implemented the will of the voters by funding that constitutional amendment. As a result, the quality of justice in Florida is now less dependent upon the local economy.
 

 Since the 1998 passage of the constitutional amendment requiring budgetary unification of the court system, the Trial Court Budget Commission, chief judges, and court administrators have actively overseen the allocation and use of the state-funded court elements established in the Florida Statutes as necessary to the adjudication of cases. The result of their work is a court system that is lean, transparent, and accountable for the state funds that are allocated. Given them collective experience, these judges and court administrators understand the resources that are required to efficiently and effectively manage a modern court system. They also understand the impact on access to justice when court resources are reduced below reasonable levels, and have reported their concerns to us.
 

 In Fiscal Year 2007-2008 and in Fiscal Year 2008-2009, the state court budget has been reduced from $491 million to $433 million, which represents a twelve percent decrease. These reductions have come from courts’ operating budgets, including expense dollars, contractual dollars, and the loss of full-time equivalent positions throughout the state courts. In order to comply with the legislative request to reduce its budget, Florida’s trial courts lost eighty-seven case managers, twenty-two magistrates, twenty-eight law clerks, eighteen due process positions (i.e., court reporters, court interpreters, and expert witnesses), and sixty-eight court administration staff. An additional twenty-one positions were eliminated in Special Session A, recently held to further reduce the Fiscal Year 2008-2009 budget. In total, 301 positions have been eliminated throughout the State Courts System, 243 of which were in the trial courts. The loss of these resources is now being felt in every community throughout Florida, and the gains made under the constitutional amendment to provide an equitable level of services in the trial courts regardless of where one lives have been compromised.
 

 
 *1179
 
 CIRCUIT COURT IMPACT
 

 Perhaps no other group is more endangered when court resources become scarce than children and families. In particular, the loss of case managers in the family division directly impacts the level of justice afforded to children and families. Examples of matters handled in the family division include custody, visitation, paternity, child support, dependency, delinquency, termination of parental rights, and domestic and repeat violence cases. Many families involved in these proceedings have limited means and represent themselves in court. Typically, family law case managers are the stewards of cases moving through the various stages of the family court process. Case managers perform intake, screening, evaluation, monitoring, tracking, coordinating, scheduling, and referral activities. Case management functions include ensuring service of process has been successfully completed prior to scheduled hearings, providing referrals to court-ordered services such as batterer’s intervention programs, and performing coordination and tracking duties across multiple cases involving one family. Case manager functions enable cases to proceed smoothly and timely through the court process. When case manager positions are reduced or eliminated, these tasks fall upon the presiding judge. This is an inefficient use of judicial resources, delays case processing, reduces service referrals that can be made, and diminishes the amount of judge time available for adjudicating cases.
 

 Magistrates support the adjudicatory process in the trial courts by performing certain quasi-judicial functions that are routine, computational, or managerial in nature, under the authority of the court. They are used most frequently in family divisions, and preside over hearings in family or child support cases, conduct status or case management conferences, establish attorney fees and costs, and submit recommended orders to judges. Perhaps most importantly, magistrates allow judges to devote their attention to more complex matters, providing a less costly means to process cases through the court system. This division of labor has proven to be both effective and economical. The reduction or elimination of twenty-two magistrates from the case processing equation has required judges to absorb their work. This inevitably contributes to case processing delays.
 

 The loss of twenty-eight staff attorneys and law clerks has also impacted judicial workload and the movement of cases, especially in postconviction criminal cases, including postconviction capital cases. Law clerks provide legal research assistance to judges, including the preparation of legal memoranda and court orders. Their work enhances the adjudication of cases and improves the quality of judicial decisions by identifying and analyzing relevant laws and cases before the court. Without this resource, a judge’s ability to process cases in a qualitative and timely fashion is diminished.
 

 An economic downturn such as the one Florida is currently experiencing increases the workload in the courts. Perhaps no other issue as clearly illustrates the relationship between an economic downturn and increased judicial workload than the mortgage foreclosure crisis. From Fiscal Year 2005-2006 to Fiscal Year 2006-2007, mortgage foreclosure filings increased by ninety-seven percent in Florida trial courts. More recent statistics show that mortgage foreclosure filings increased by 396 percent from Fiscal Year 2005-2006 to Fiscal Year 2007-2008. In fact, according to RealtyTrac,
 
 [2]
 
 Florida has the second
 
 *1180
 
 highest rate of mortgage foreclosures in the country.
 
 [3]
 
 The sheer volume of mortgage foreclosure cases in our circuit civil divisions has been overwhelming. Although many chief judges have allocated additional judicial resources into the circuit civil divisions, the trial judges have been unable to keep pace with the rapid accumulation of mortgage foreclosure cases.
 
 [4]
 
 The current clearance rate for mortgage foreclosure cases is forty-one percent. Thus, homeowners and lending institutions are experiencing delays in either getting on a judicial docket or having their cases disposed of. Communities are also impacted with properties being left vacant and uncared for during the foreclosure process. Vacant properties can lead to increases in property crimes such as burglaries or vandalism, which in turn will impact the criminal justice system.
 

 COUNTY COURT IMPACT
 

 The loss of funds to hire Civil Traffic Infraction Hearing Officers has had a substantial impact on the operations of the county courts. Civil Traffic Infraction Hearing Officers are members of The Florida Bar who contract with the courts to preside over civil traffic infraction hearings.
 
 [5]
 
 They are an economical and effective resource that enables county court judges to spend more of their time adjudicating heavy county criminal and civil caseloads. The budget for traffic hearing officers was substantially reduced in the last fiscal year, and due to the uncertainty regarding additional reductions this fiscal year, no funding for this resource has been allocated during the current fiscal year. Now that Special Session A has been completed, what remains of this budget will be allocated to the circuits so that traffic hearing officers will be on line once again, although their availability will be limited. The loss of this resource on a permanent basis would be two-fold: first, county court judges would spend a larger portion of their time presiding over traffic matters; and second, more cases would be dismissed when judges cannot hear them within the required timeframe. The end result is case delay and backlog in county court and the loss of revenues resulting from fines imposed. Some chief judges also report that citizens must travel greater distances to attend traffic court when Civil Traffic Infraction Hearing Officers are no longer available in some branch courthouses; hence, citizens seeking to resolve their civil traffic infractions incur greater inconvenience and cost.
 

 STATE ATTORNEY AND PUBLIC DEFENDER STAFFING
 

 This Court is increasingly concerned about the relationship between the certification of new judgeships, specifically those judges who would be assigned to criminal divisions, and the staffing complements of state attorneys’ and public defenders’ offices. We relate the criminal justice system to a three-legged stool comprised of judges, state attorneys, and public defenders. If one leg is compromised, the stool cannot function as designed. Authorizing judgeships without corollary funding for state attorneys and public defenders cre
 
 *1181
 
 ates an imbalance in the criminal justice system. We encourage the Legislature to provide for sufficient staffing of state attorneys’ and public defenders’ offices whenever a judgeship is authorized and designated for the criminal division.
 

 USE OF SENIOR JUDGES AND SUSTAINED NET NEED
 

 Florida has used a weighted caseload methodology to evaluate judicial workload since 1999. Over the last nine years we have conducted a continual evaluation of the certification process in an ongoing effort to enhance and refine it. This year we have incorporated a new feature into our methodology: the use of sustained judicial need.
 

 In last year’s certification of need opinion
 
 [6]
 
 we directed the Commission on Trial Court Performance and Accountability to study the use of senior judges and the implications for including senior judge availability when evaluating judicial workload. The Commission, through its Court Statistics and Workload Committee, surveyed the chief judges and analyzed how senior judges are being used in the trial courts.
 

 In its final report on this subject,
 
 [7]
 
 the Commission concluded that the current judicial certification framework does not assess all workload. Temporary spikes in' filings and workload due to extended absences of sitting judges have historically not been included in the calculation of judicial need. And, based on the information provided by the chief judges, it appeal's that senior judge resources are used primarily to address workload beyond the certification model.
 

 The Commission made the following four primary recommendations to the supreme court:
 

 1. The supreme court should not include the utilization of senior judges in its certification methodology.
 

 2. Senior judge resources should be requested during the legislative budget process and allocated to the circuits based on all need above sustained need, including filing spikes, unanticipated vacancies, extended leave, and backlog need.
 

 3. The supreme court should extend the judicial weighted workload model to define and calculate sustained need.
 

 4. The Court Statistics and Workload Committee should endeavor to improve circuit level reporting on senior judge usage to achieve accountability and transparency. This enhanced reporting is a critical component of the allocation process.
 

 The Court adopts the recommendations of the Commission and will direct the Commission to refine those areas identified in the report necessary to accomplish full implementation.
 

 In regard to recommendation 3, above, the Court concludes that the most appropriate and valid measure of sustained judicial need in Florida is a minimum of the calculated net need over a three-year period. This three-year period will be recalculated each year to encompass the current year’s net need and the previous two years’ net need in the sustained judicial need calculation. This new methodology has been applied to this year’s certification
 
 *1182
 
 of trial court judges. In addition, this Court has examined case filing and disposition data, analyzed various judicial workload indicators, and considered judgeship requests submitted by the lower courts. Our analysis follows.
 

 TRIAL COURT CERTIFICATION
 

 In Fiscal Year 2006-2007, approximately ninety-nine percent of all court filings in Florida were processed in the circuit and county courts. Trial court judges are on the front lines in dispensing justice. Their work is vital to our citizens and businesses, who expect the judicial branch to help resolve issues fairly, peaceably, expeditiously, and in a manner that promotes the rule of law.
 

 As previously mentioned, this Court uses a case-weighting system based on accepted standards of measurement in determining the need for additional judges.
 
 [8]
 
 The case weighting system distinguishes different types of cases and assigns different amounts of time that must be spent on each type of case, producing a total judicial need for each circuit. Additionally, we adjust for differing jury trial rates in each circuit and county and consider the actual number of judges requested by the chief judge. The resulting certification is an objective statement of what the trial courts need to responsibly meet their workload obligations.
 
 [9]
 

 From Fiscal Year 2005-2006 to Fiscal Year 2006-2007, filings increased by seven percent in circuit court. Growth in civil filings by thirty-eight percent is the main contributing factor to the statewide increase in circuit court. Real property and mortgage foreclosure case filings have nearly doubled from the previous fiscal year, representing an increase of 55,568 filings. Contract and indebtedness and condominium case filings have also risen considerably, seventeen percent and 147 percent respectively.
 

 Substantial growth in filings in all felony case types also contributed to the overall rise in circuit court filings from Fiscal Year 2005-2006 to Fiscal Year 2006-2007. The largest felony case type in terms of number of filings-property crime (including burglary, theft, worthless checks, and other felonies)-increased by six percent. Additionally, capital murder and noncapital murder case filings rose by a considerable percentage, seventeen percent and twenty-two percent respectively.
 

 County court filings experienced significant growth from Fiscal Year 2005-2006 to Fiscal Year 2006-2007, as well, with statewide filings increasing by seven percent (excluding civil traffic infractions). Growth in civil filings was the main contributing factor to the statewide increase in county court, with overall civil filings rising by thirteen percent. County court cases involving small claims (up to $5,000) and civil ($5,001 to $15,000) increased by twenty-two percent and seventeen percent
 
 *1183
 
 respectively. In county criminal, statewide filings grew by four percent, which included a four percent increase in misdemeanors and a twenty-three percent increase in county ordinance case filings.
 

 In light of the foregoing considerations, this Court certifies the need for twenty-nine new circuit court judges for Fiscal Year 2009-2010, distributed as follows:
 

 1. Five additional circuit court judges for the First Judicial Circuit;
 

 2. Four additional circuit court judges for the Fifth Judicial Circuit;
 

 3. Three additional circuit court judges for the Twentieth Judicial Circuit;
 

 4. Two additional circuit court judges each for the Seventh, Ninth, Tenth, Thirteenth, Fourteenth, and Nineteenth Judicial Circuits; and
 

 5. One additional circuit court judge each for the Second, Eighth, Eleventh, Fifteenth, and Eighteenth Judicial Circuits.
 

 We also certify the need for thirty-nine new county court judges for Fiscal Year 2009-2010, as follows:
 

 1. Six additional county court judges each for Duval, Miami-Dade, and Broward Counties;
 

 2. Five additional county court judges each for Hillsborough and Palm Beach Counties;
 

 3. Two additional county court judges each for Volusia and Orange Counties; and
 

 4. One additional county court judge each for Columbia, Marion, Alachua, Polk, Brevard, St. Lucie, and Lee Counties.
 

 In addition to the judges certified today, we specifically reviewed requests from chief judges to certify two circuit judges in the Ninth and Eleventh Judicial Circuits and to certify one circuit judge in the Twelfth and Twentieth Judicial Circuits. We note that the sustained judicial need is less than 0.5 for each of those requested judgeships.
 
 [10]
 
 We have determined that in the absence of special circumstances, we must deny these requests.
 

 We also reviewed requests from chief judges to certify additional county court judges for Escambia, Okaloosa, Duval, Citrus, Lake, St. Johns, Orange, Osceola, Highlands, Polk, Manatee, Sarasota, Bay, Broward, Brevard, Seminole, St. Lucie, Collier, and Lee Counties. We have determined that in the absence of special circumstances, we must deny these requests as well.
 

 DISTRICT COURTS OF APPEAL CERTIFICATION
 

 Florida Rule of Judicial Administration 2.240(b)(2) delineates the criteria for certifying the need for additional judges in the district courts of appeal. Based on these criteria, we do not certify the need for any additional district court judges. Our determination is bolstered by the fact that the district courts have not requested the certification of any additional judgeships this year.
 

 Our analysis indicates that the Second and Fourth District Courts of Appeal have the highest weighted caseloads per judge.
 
 [11]
 
 
 *1184
 
 In Fiscal Year 2007-2008 the weighted caseload per judge in the Second District was 312 and in the Fourth District was 302. Even though qualified for the certification of a judgeship, neither district is requesting one in the face of the current budget situation and staffing shortages. As the chief judge of the Second District observed, “Recent reductions in this court’s salary and benefits budget have made it impossible to fully staff the fourteen judges who currently serve on the court. Since the beginning of FY 2008-09 on July 1, four of our judges have functioned with less than the full complement of two staff attorneys in their suites.” He further states, “At the same time, two of our Central Staff attorney positions are unfilled and will remain so for the remainder of the fiscal year.” The chief judge also notes that “it is impossible to predict the precise impact of this understaffing,” but estimates that “fully one-fifth of the cases filed in our court this fiscal year will go unassigned for lack of professional staff.”
 
 [12]
 
 Similar observations were shared with this Court by the chief judge of the Fourth District Court of Appeal. We share the concerns of the chief judges of the district courts and offer the above examples to the Legislature as evidence of the real impact the budget reductions are having on the district courts of appeal and consequently the citizens of Florida.
 

 CONCLUSION
 

 This opinion fulfills this Court’s constitutional obligation to determine the need for additional judges in Fiscal Year 2009-2010. It also reflects the court system’s commitment to continually monitor and evaluate judicial workload by incorporating refinements to our methodology. We believe that the sustained judicial need issue described in this opinion will enhance the long-term assessment of judicial need and better reflect the manner in which valued resources are being used in the courts. We thank the Commission on Trial Court Performance and Accountability and the Court Statistics and Workload Committee for their ongoing efforts to improve the evaluation of judicial workload.
 

 Florida’s court system remains among the finest in the country. Our judges serve a vital role in keeping our courts open and accessible to all. Yet the demands on our judiciary from sustained growth in cases and demands for access cannot be efficiently and effectively met because of the significant loss of court resources. With the $49 million budget reduction the courts have experienced over the last two fiscal years, judicial dockets are full, scheduling is problematic, and case processing times are delayed. Clearance rates are falling and backlogs are developing. Unfortunately, we anticipate that this trend will continue unless further steps are taken to stabilize court funding.
 

 Although we have identified our judicial need in this opinion, our primary concern at this time is with the reductions to court support staff and supplemental resources. Florida’s court system can ill afford to sustain any further reductions to the statutorily defined court elements. To do so would undermine the administration of justice. We are encouraged by the creation of the State Courts Revenue Trust Fund in Special Session A as an initial positive step by the Legislature to address the courts’ funding needs.
 

 We submit this opinion recognizing that the State of Florida is experiencing difficult economic times. This Court strongly encourages the Legislature to maintain
 
 *1185
 
 court funding at a level that allows the court system to meet its constitutional obligations. In better economic times, we encourage the Legislature to authorize the circuit and county court judgeships certified in this opinion.
 

 It is so ordered.
 

 WELLS, PARIENTE, LEWIS, CANADY, POLSTON, and LABARGA, JJ., concur.
 

 [1]
 

 . Article V, section 9 of the Florida Constitution provides in pertinent part:
 

 Determination of number of judges. — The supreme court shall establish by rule uniform criteria for the determination of the need for additional judges except supreme court justices, the necessity for decreasing the number of judges and for increasing, decreasing or redefining appellate districts and judicial circuits. If the supreme court finds that a need exists for increasing or decreasing the number of judges or increasing, decreasing or redefining appellate districts and judicial circuits, it shall, prior to the next regular session of the legislature, certify to the legislature its findings and recommendations concerning such need.
 

 [2]
 

 . RealtyTrac is an online realtor website that tracks mortgage foreclosures by state and
 
 *1180
 
 may be found at
 
 www.realtytrac.com.
 

 [3]
 

 . RealtyTrac,
 
 Foreclosure Activity Increases 81 Percent in 2008,
 
 http://www.realtytrac.com/ foreclosure/foreclosure-rates.html (last visited Feb. 10, 2009).
 

 [4]
 

 . A recently completed study by The Washington Economics Group, Inc., has estimated delay in processing mortgage foreclosure cases costs Florida’s economy $17 billion a year.
 
 The Economic Impacts of Inadequate Funding for Florida Courts,
 
 http://www. floridabar.org/TFB/TFBResources/nsf/ Attachment.
 

 [5]
 

 .In Fiscal Year 2006-2007, Civil Traffic Infraction Hearing Officers heard more than 413,000 cases in Florida.
 

 [6]
 

 . See
 
 In re Amended Certification of Need for Additional Judges,
 
 980 So.2d 1045 (Fla.2008).
 

 [7]
 

 . Office of State Courts Administrator,
 
 Recommendations on Senior Judge Resources in the Judicial Weighted Workload Model,
 
 (2008) (prepared for the Trial Court Performance and Accountability Commission by the Office of the State Courts Administrator),
 
 available at
 
 http://www. ilcourts.org/gen_pub-lic/pubs/bin/JudgeResourceReport.pdf.
 

 [8]
 

 . This system was developed in response to the proviso language of the 1998 General Appropriations Act, in which the Legislature directed that the judicial branch employ a certification methodology that relies on case weights and calculations of available judge time to determine the need for additional trial court judges.
 
 See
 
 ch. 98-422, § 7, at 3963, Laws of Fla. Pursuant to this direction, the judicial branch undertook an extensive project to design and implement a weighted caseload system, assisted by the National Center for State Courts and endorsed by the Office of Program Policy Analysis and Government Accountability.
 

 [9]
 

 . Also important to note is that the current case weights factor in the availability of other court resources in the disposition of cases. Continued reductions in staff resources increase judicial time spent on each case and could result in the need for even more judges than what the current methodology reflects.
 

 [10]
 

 . Total judicial need is the total number of judges required to complete all expected workload. Net judicial need is the difference between the total judicial need and the number of existing judges. Sustained net need is defined as constant need over time.
 

 [11]
 

 . The number established in the rule, 280, does not represent the filings per judge but is a weighted threshold calculated according to the process described in the 2005 report of the Commission on District Court of Appeal Performance and Accountability. Supreme Court of Florida Commission on District Court of Appeal Performance and Accountability,
 
 DCA Workload Report to the Supreme Court
 
 (2005),
 
 available at
 
 http://www.ilcourts. org/gen_public/court-services/CourtServices PandA.shtml.
 

 [12]
 

 . Certification request letter from Slevan T. Northcutt, Chief Judge, Second District Court of Appeal, to Chair, District Court of Appeal, Budget Commission (Aug. 15, 2008) (on file with Office of State Courts Administrator).