QUINCE, C.J.
 

 Pursuant to our constitutional obligation to determine the state’s need for additional judges in Fiscal Year 2010-2011 and to certify “our findings and recommendations about that need” to the Legislature,
 
 [1]
 
 we hereby certify the need for additional judicial resources as follows.
 

 Certification is “the sole mechanism established by our constitution for a systematic and uniform assessment of this need.”
 
 In re Certification of Need for Additional Judges,
 
 889 So.2d 734, 735 (Fla.2004).
 

 This Court acknowledges that Florida and our country remain in an economic recession. Like all sectors of our society, the judicial branch is coping with the impact these economic forces are having on the daily operations of our courts, which are faced with increased workloads, reduced resources, and ever-increasing demands on judges and staff. Together, these factors impede the proper administration of justice.
 

 For our trial courts, fewer resources and no new judgeships for the last three fiscal years have slowed ease processing times and negatively impacted clearance rates. Justice in many instances is delayed.
 
 [2]
 
 
 *1111
 
 Moreover, the mortgage foreclosure crisis continues unabated with a second wave of foreclosures forecast.
 
 [3]
 
 These foreclosures have implications for homeowners, lending institutions, neighborhoods, the courts, and Florida’s economy. Further, budget reductions and the resultant loss of supplemental judicial resources, such as case managers, magistrates, and staff attorneys, continue to impact the courts’ ability to respond effectively to the needs of children, families, the business sector, and the public. Although the central purpose of this opinion is to fulfill our constitutional obligation to discuss specifically the certification of judicial need, we must place the consideration of judicial need in a larger justice system context. Therefore, this Court first addresses recent developments in court system funding and the loss of non-judge resources before dii’ectly addressing the implications for judicial certification.
 

 STATE COURTS REVENUE TRUST FUND
 

 Because of the economic crisis and as part of its ongoing effort to seek stable funding for Florida’s State Courts System, the Supreme Court has worked with legislative leaders to identify a stable funding source for Florida’s courts. In response, during Special Session A 2009, the Legislature created the State Courts Revenue Trust Fund. The fund supports most court operations with the exception of some judicial salaries which remain general revenue funded.
 

 The primary revenue stream supplying the trust fund became effective July 1, 2009. The Supreme Court is grateful to the Legislature for the establishment of this fund, which we believe will help stabilize Florida’s court system. The creation of the State Courts Revenue Trust Fund is also consistent with the Seven Principles of Court Funding advanced through the State Courts System’s
 
 Funding Justice
 
 initiative.
 
 [4]
 

 Nevertheless, while the new trust fund appears to promise greater long-term stability, it has not yet impacted the budgetary reductions experienced by the judicial branch over the last two fiscal years. The budget reductions, coupled with no new judgeships for the last three fiscal years, have combined to create an environment of increased judicial workload, caseload backlog, and court delay.
 

 BUDGET REDUCTIONS
 

 Since July 1, 2007, the State Courts System has experienced a ten percent budget reduction. These reductions have come from our operating budget, including expense dollars, contractual dollars, and the loss of positions throughout the state. Strict hiring and travel policies have also been in effect for the last two years. These restrictions were necessary to comply with overall reductions to our budget. Nonetheless, they come at a price. Court operations have been significantly hampered by the loss of positions that provide direct support to our judges.
 

 
 *1112
 
 In order to comply with the legislative request to reduce its budget, Florida’s court system over the last three budget years has lost or eliminated 103.25 case managers, 23.75 magistrates and associated administrative staff, 38.5 law clerks, 18.5 due process positions (i.e., court reporters, court interpreters, and expert witnesses), and 106.5 positions from court administration, appellate clerks’ offices, and appellate marshals’ offices. Of the 290.5 total positions lost in the judicial branch, 249 trial court positions have been eliminated throughout the state. Also substantially reduced were contractual dollars used to hire Civil Traffic Infraction Hearing Officers (CTIHO). As a result, much work previously performed by CTIHOs was absorbed by our county court judges.
 

 LOST RESOURCES AND CASE PROCESSING TIMES
 

 The budget reductions and loss of positions sustained by the State Courts System over the last two fiscal years continue to be felt in every judicial circuit. We cannot overstate the causal relationship between the loss of supplemental resources and the increases in case processing times. When judges must absorb the workload of case managers, staff attorneys, or hearing officers, case processing times inevitably worsen. The net result is court delay. Moreover, having judges perform the work of subordinate staff is not a prudent use of higher level judicial resources. Judicial time is best spent adjudicating cases, and the loss of supplemental resources has consequences for litigants across all case types. While Floridians continue to access their courts initially through filings, they are being forced to wait inordinate periods of time for final resolution of their cases while judges find it more and more difficult to advance their dockets and clear out backlogged matters.
 
 [5]
 

 CIRCUIT COURT IMPACT
 

 Children and families are especially at risk when resources become scarce. In particular, the loss of case managers in our family divisions directly threatens the level of justice afforded to children and families. Case managers are acutely needed in matters involving custody, visitation, paternity, child support, dependency, delinquency, termination of parental rights, and domestic and repeat violence. Many families involved in such cases have limited means and represent themselves in court. Additionally, many of these families have multiple cases which require coordination to eliminate duplicate hearings and orders.
 

 Typically, our family law case managers shepherd cases through the court system by performing intake, screening, evaluation, monitoring, coordinating, scheduling, and referral activities. These activities enable cases to proceed smoothly and timely through the court process. When these positions are eliminated, these tasks fall on the presiding judge. This scenario creates case processing delays, non-referrals, or the minimization of judicial time spent helping children and families.
 

 In addition to losing our case management support, our court system has also lost magistrates and attendant administrative staff statewide during this period. Magistrates support the adjudicatory process in the trial courts by performing certain quasi-judicial functions that are routine, computational, or managerial in
 
 *1113
 
 nature under the authority of the court. Frequently, they are assigned to family law divisions and assist judges by hearing matters related to paternity, dissolution, custody, child support and visitation. They frequently establish attorney fees and costs, submit recommended orders to a judge, and ensure the collection of fines. Them availability enables judges to focus their time on more contentious and complex issues requiring judicial expertise. This division of labor has proven to be both effective and economical. When magistrates are either reduced or eliminated from the ease processing equation, judges must then absorb their work. This inevitably contributes to case processing delays.
 

 The loss of staff attorneys and law clerks similarly has affected judicial workload and impeded the movement of cases especially in post-conviction criminal cases. Law clerks provide basic legal research assistance to judges, including the preparation of legal memoranda and drafts of court orders. Their work enhances the adjudication of cases because they are able to identify and analyze relevant laws and cases before the court. Without this resource, a judge’s ability to process cases in a manner that ensures both quality and efficiency is diminished because the judge is retrieving materials and unable to delegate basic and routine legal research.
 

 Other factors contributing to circuit court workload include the mortgage foreclosure crisis previously mentioned which continues to overwhelm Florida’s court system. Although the dramatic increase in mortgage foreclosure filings is expected to abate at some future date and therefore may not be a part of the long-term sustained net need, there is evidence that a second wave of foreclosures is now entering the court system and that this workload issue will persist. Various media reports note that many of these new foreclosures are fueled by double digit unemployment, declining housing prices, and the lingering recession. Over a 36-month period (Fiscal Year 2005-2006 to Fiscal Year 2007-2008), real property/mortgage foreclosure filings increased by 396 percent in our trial courts. During the same time period, the clearance rate for real property/mortgage foreclosure cases decreased by 52 percent, from 94 percent in Fiscal Year 2005-2006 to 42 percent in Fiscal Year 2007-2008. According to Realty Trac,
 
 [6]
 
 Florida has the
 
 third
 
 highest rate of mortgage foreclosures in the country with one in every 158 housing units in foreclosure. Condominium foreclosures are contributing to the crisis.
 

 COUNTY COURT IMPACT
 

 As reflected in dropping clearance rates, no other resource has hindered the operations of county courts more than the loss of a substantial portion of the Civil Traffic Infraction Hearing Officer (CTIHO) monies. CTIHOs are members of The Florida Bar who contract with the courts to preside over civil traffic infraction hearings.
 
 [7]
 
 They are an economical and effective resource dedicated to the disposition of civil traffic infractions. Their availability enables county court judges to adjudicate county criminal and civil matters in a timely manner. In several circuits, the availability of CTIHOs has also enabled county court judges to assist with judicial workload in circuit court. Therefore, the loss of this resource is two-fold: (1) county
 
 *1114
 
 judges now provide diminished assistance in circuit court, and (2) county judges must now spend a far greater portion of their time presiding over traffic matters. The cascading effect is less time spent assisting circuit court judges, less time focused on more complex county court criminal and civil matters, and more time spent on traffic cases. The net result is case delay and backlog in circuit and county court.
 

 Although this opinion is constitutionally required to discuss judicial need, this Court finds it important to advise the Legislature that the elimination of case managers, law clerks, magistrates, court reporters, and court interpreters, coupled with no new trial judges in three years, has long-term structural implications for the court system. If the Legislature is unable to provide new judgeships due to the economic crisis, we encourage it to consider all the more seriously restoring positions lost over the last two years, as has been requested in our annual legislative budget request.
 

 STATE ATTORNEY, PUBLIC DEFENDER, REGIONAL COUNSEL, AND CAPITAL COLLATERAL REPRESENTATIVE STAFFING
 

 This Court also remains concerned about the staffing levels of state attorney and public defender offices, the Offices of Regional Counsel, and the offices of the Capital Collateral Representatives. The need persists to reconcile the certification of new judgeships with sufficient staffing for these entities. This is a systemic issue and should be approached as such. We encourage the Legislature to consider the needs of the state attorneys, public defenders, Offices of Regional Counsel, and Capital Collateral Representatives if new judgeships are authorized for our criminal divisions, particularly in light of the staffing reductions they have experienced in recent years.
 

 TRIAL COURT CERTIFICATION
 

 For some time, this Court has used a case-weighting system based on accepted standards of measurement in determining the need for additional judges.
 
 [8]
 
 The case weighting system distinguishes different types of cases and assigns different amounts of time that must be spent on cases of each type, producing a total judicial need for each circuit. Additionally, we adjust for differing jury trial rates in each circuit and county and consider the actual number of judges requested by the chief judge in each circuit. The resulting certification is an objective statement of what the trial courts need to meet their workload.
 

 Over the last ten years, we have conducted a continuous evaluation of the certification process. As noted in last year’s opinion, we are now applying the use of sustained judicial need into our methodology. Sustained judicial need is the minimum of the calculated net need over a three-year period. Each year this three year “window” moves forward a year, considering the current year’s net need and the previous two years’ net need in the sustained need calculation. Any new judges received during the previous year’s
 
 *1115
 
 session are factored into the current year’s net need.
 
 [9]
 

 From Fiscal Year 2006-2007 to Fiscal Year 2007-2008 total filings have increased by 21 percent in circuit court. Growth in civil filings by 85 percent is the main contributing factor to the statewide increase in circuit court. Real property and mortgage foreclosure case filings have more than doubled from the previous fiscal year, representing an increase of 171,426 filings. Product liability, condominium, and contract and indebtedness case filings have also risen considerably, by 267 percent, 117 percent, and 29 percent respectively.
 

 Substantial growth in filings in felony case types also contributed to an overall rise in circuit court filings from Fiscal Year 2006-2007 to Fiscal Year 2007-2008. The largest felony case type in terms of number of filings, property crime (including burglary, theft, worthless checks, and other felonies) increased by five percent. Additionally, capital murder and robbery case filings also rose by a considerable percentage, six and 15 percent respectively-
 

 County court filings experienced significant growth from Fiscal Year 2006-2007 to Fiscal Year 2007-2008 as well, with statewide filings increasing by five percent (excluding civil traffic infractions). Growth in civil filings was also the main contributing factor to the statewide increase in county court, with overall civil filings rising by 14 percent. Those cases involving small claims (up to $5,000), civil ($5,001 to $15,000), and evictions increased by 16 percent, 20 percent, and six percent, respectively.
 

 Further, the overall statewide circuit court clearance rate
 
 [10]
 
 from Fiscal Year 2006-2007 to Fiscal Year 2007-2008 has decreased by ten percent. Clearance rates in all divisions dropped in Fiscal Year 2007-2008, with the lone exception of the circuit criminal division. The chief judges of the trial courts are ensuring that all due process (e.g., speedy trials) and other constitutional requirements related to felony proceedings are being met. This often requires the redeployment of judicial resources from other court divisions. The circuit civil division experienced a significant clearance rate decline of nineteen percent, statewide. Similarly, the county court clearance rate decreased by four percent with the county civil division declining by five percent.
 

 The sustained impact of the mortgage foreclosure crisis is even further compromising the clearance rates in circuit civil divisions for all circuits in Florida. In many jurisdictions, circuit civil judges cannot keep pace with the volume. As a result, homeowners and lending institutions are subject to increasingly long delays for resolution to their cases.
 
 [11]
 

 In view of the foregoing considerations, this Court certifies the need for 37 new circuit court judges for Fiscal Year 2010-2011, distributed as follows:
 

 1. Five additional circuit court judges each for the First and Fifth circuits;
 

 
 *1116
 
 2. Three additional circuit court judges each for the Seventh, Nineteenth, and Twentieth circuits;
 

 3. Two additional circuit court judges each for the Fourth, Sixth, Ninth, Tenth, Fourteenth, and Fifteenth circuits; and
 

 4. One additional circuit court judge each for the Second, Eighth, Eleventh, Twelfth, Thirteenth, and Eighteenth circuits.
 

 Further, we certify the need for 53 new county court judges for Fiscal Year 2010-2011, as follows:
 

 1. Eight additional county court judges for Duval County;
 

 2. Six additional county court judges each for Miami-Dade and Broward counties;
 

 3. Five additional county court judges for Palm Beach County;
 

 4. Three additional county court judges for Hillsborough County;
 

 5. Two additional county court judges each for Pinellas, Volusia, Orange, Polk, and Lee counties; and
 

 6. One additional county court judge each for Okaloosa, Columbia, Citrus, Lake, Marion, Alachua, Osceola, Highlands, Manatee, Sarasota, Bay, Brevard, Seminole, St. Lucie, and Collier counties.
 

 In addition to the judges certified above, we also have reviewed the following requests, which we deny for the following reasons. We have specifically reviewed the requests from chief judges to certify three circuit court judges in the Ninth Judicial Circuit and Eleventh Judicial Circuit and note that the sustained judicial need is less than the judgeships requested.
 
 [12]
 
 Accordingly, we deny those requests.
 

 We have also reviewed the chief judge’s requests for an additional county court judge for Pasco County. We have determined that in the absence of special circumstances, we must also deny this request. We emphasize that in addition to mathematical calculations, our staff performs extensive analysis of each circuit’s request in order to analyze the availability of supplemental resources and any special circumstances justifying an exception.
 

 DISTRICT COURTS OF APPEAL
 

 Like the trial courts, the district courts have also experienced the loss of supplemental support staff due to the economic crisis. During Fiscal Year 2008-2009 a total of 25.5 FTE were lost due to reductions in the district courts’ collective budget. As with the circuit courts, the loss of staff attorneys and law clerks in the district courts has affected judicial workload and impeded the movement of cases. Staff attorneys provide legal research assistance, prepare legal memoranda, and assist in drafting opinions. The absence of staff attorneys and other court support staff that were lost has contributed to more lengthy case processing times and diminished clearance rates in the district courts.
 

 Under the weighted caseload per judge threshold set forth in rule 2.240(b)(2)(B), Florida Rules of Judicial Administration, “[t]he court will presume that there is a need for an additional appellate court judgeship in any district for which a request is made and where the relative weight of the cases disposed on the merits per judge would have exceeded 280 after
 
 *1117
 
 application of the proposed additional judge(s).”
 
 [13]
 

 Only the Second District requested a judgeship, citing numerous workload factors including increased filings, decreasing clearance rates, post-conviction appeals, reduced staffing complements, and limited judicial availability. Although qualified to receive a judgeship last year, they did not request one, citing the economic climate within the state. While we' are sympathetic to the workload in the Second District, using our certification methodology, they do not currently qualify for an additional judgeship after the methodology is applied. Therefore, their request is denied.
 

 DISTRICT COURTS OF APPEAL CERTIFICATION
 

 In keeping with our policy of not requesting judgeships unless qualified and requested by the chief judge of a district court, we do not certify the need for any additional district court judges.
 

 CONCLUSION
 

 Florida’s court system remains under duress. The state and national recession of the last two years and the resulting budget reductions for the courts are taking a sustained toll on Florida’s judges, court staff, and most importantly those who are accessing our courts. Case filings are up and clearance rates are down. Judicial dockets are full, scheduling is problematic, and ease processing times are delayed.
 

 Florida’s court system has now gone three years without the authorization of any new judgeships despite a demonstrated and sustained need. The absence of new judgeships is now being felt by all sectors of our society who seek justice through the court system.
 

 We submit this opinion recognizing that it is difficult for the Legislature to fund the many competing critical issues confronting our state given the fiscal crisis the state is enduring. If funds become available, we encourage the Legislature to authorize those judgeships certified in our circuit and county courts. Additionally, while we have identified our judicial need in this opinion, we are equally concerned with the allocation of adequate court support staff and supplemental resources in the statutorily defined court elements that will enable the courts to respond effectively to the needs of children, families, the business sector, and the public. Without these court support staff and supplemental resources, the administration of justice is undermined.
 

 It is so ordered.
 

 PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ„ concur.
 

 [1]
 

 . Article V, section 9 of the Florida Constitution provides in pertinent part:
 

 Determination of number of judges. — The supreme court shall establish by rule uniform criteria for the determination of the need for additional judges except supreme court justices, the necessity for decreasing the number of judges and for increasing, decreasing or redefining appellate districts and judicial circuits. If the supreme court finds that a need exists for increasing or decreasing the number of judges or increasing, decreasing or redefining appellate districts and judicial circuits, it shall, prior to the next regular session of the legislature, certify to the legislature its findings and recommendations concerning such need.
 

 [2]
 

 .
 
 See
 
 Office of the State Courts Administrator,
 
 Clearance Rate Dashboard,
 
 Quarter Ending September 30, 2009 (Data as of November 5, 2009), http://www.flcourts.org/gen_public/ slats/bin/ClearanceRateDashboard.pdf.
 

 [3]
 

 .
 
 See
 
 Mortgage Bankers Ass'n,
 
 Delinquencies Continue to Climb in Latest MBA National Delinquency Survey,
 
 Nov. 19, 2009, http:// www.mbaa.org/NewsandMedia/PressCenter/ 71112.htm; Seeking AIpha.com,
 
 Seasonal Bump in Case-Shiller Home Price Index Abates,
 
 Nov. 29, 2009, http://seekingalpha. com/article/175233-seasonal-bump-in-case-shiller-homeprice-index-abates; Realty Trac,
 
 Job Losses Foreshadow More Foreclosures, Risk,
 
 hup://www.realtytrac.com/content management/realtytraclibrary.aspx? channelid=8&accnt=0&itemid=7727 (last visited February 23, 2010).
 

 [4]
 

 .
 
 See
 
 Florida State Courts,
 
 Funding Justice,
 
 http://www.flcourts.org/gen_public/funding/ index.shml (last visited Feb. 23, 2010).
 

 [5]
 

 . A 2008 study by the Washington Economics Group, Inc., has estimated delay in case processing mortgage foreclosure cases costs Florida's economy $17 billion a year. Washington Economics Group,
 
 The Economic Impacts of Inadequate Funding for Florida's Courts
 
 (2008).
 

 [6]
 

 . Realty Trac is an online realtor website that tracks mortgage foreclosures by state and may be found at www.realtytrac.com.
 

 [7]
 

 . In Fiscal Year 2007-2008, Civil Traffic Infraction Hearing Officers presided over approximately 489,162 cases in Florida.
 

 [8]
 

 . This system was developed in response to the proviso language of the 1998 General Appropriations Act, in which the Legislature directed that the judicial branch employ a certification methodology that relies on case weights and calculations of available judge time to determine the need for additional trial court judges.
 
 See
 
 Ch. 98-422, § 7, at 3963, Laws of Fla. Pursuant to this direction, the judicial branch undertook an extensive project to design and implement a weighted caseload system, assisted by the National Center for State Courts and endorsed by the Office of Program Policy Analysis and Government Accountability.
 

 [9]
 

 .
 
 In re Certification of Need for Additional Judges,
 
 3 So.3d 1177, 1181-82 (Fla.2009).
 

 [10]
 

 . The “clearance rate” is a calculation of the number of cases disposed of divided by the number of cases filed in the same year. The clearance rate has a reasonable ease of calculation, is a useful measure of the responsiveness of a court to the demand for services, and is nationally recognized as a measure of court performance.
 

 [11]
 

 .See
 
 Florida Supreme Court Task Force on Residential Mortgage Foreclosure Cases,
 
 Final Report and Recommendations on Residential Mortgage Foreclosure Cases
 
 (2009),
 
 available at
 
 http://www.floridasupremecourt.org/ pub_info/foreclosure.shtml.
 

 [12]
 

 . Total judicial need is the total number of judges required to complete all expected workload. Net judicial need is the difference between the total judicial need and the number of existing judges. Sustained net need is defined as constant need over time.
 

 [13]
 

 . The number established in the rule, 280, does not represent the filings per judge but is a weighted threshold calculated according to the process described in the DCA Workload Report issued in 2005 by the Commission on District Court of Appeal Performance and Accountability.
 
 See
 
 Supreme Court of Florida Commission on District Court of Appeal Performance and Accountability,
 
 DCA Workload Report to the Supreme Court
 
 (2005),
 
 available at
 
 http://www.flcourls.org,gen_public/court-services/bin/2005DCAWorkloadReport.pdf.