23 So.3d 140 (2009)
Keith Robinson OKEN, M.D. and Mayo Clinic of Florida, a Florida corporation, Petitioners,
v.
Ted WILLIAMS, Respondent.
No. 1D08-3398.
District Court of Appeal of Florida, First District.
September 30, 2009.
Rehearing Denied December 15, 2009.
*141 Earle E. Googe, Jr. and Megan B. Ryan of Smith Hulsey & Busey, Jacksonville; and Marjorie C. Allen, In-House Legal Counsel, Mayo Clinic Jacksonville, Jacksonville, for Petitioners.
Bruce S. Bullock of Bullock & Bullock, P.A., Jacksonville, for Respondent.
WOLF, J.
We review a Petition for Writ of Certiorari claiming error in the trial court's Order Denying Motion of Defendants to Dismiss Pursuant to Section 766.206, Fla. Stat. The issue is whether the trial court departed from the essential requirements of law in denying petitioners' (defendants, Keith Robert Oken, M.D., and Mayo Clinic of Florida) motion to dismiss respondent's (plaintiff, Ted Williams) malpractice action for failing to timely comply with the statutory presuit requirements by failing to attach a corroborating affidavit of a "medical expert" as defined by section 766.202(6), Florida Statutes. We find merit in petitioners' claim in that the affidavit, on its face, fails to comply with the statute. We, therefore, grant the petition.
Respondent sent a notice of his intent to initiate litigation to Dr. Oken and the Mayo Clinic of Florida. The notice alleged that on February 4, 2005, respondent went to the emergency room at St. Luke's Hospital complaining of chest pain. The notice further alleged that while at the hospital, respondent was assessed by Catherine Northrop, M.D., who ordered, among other things, a consultation with Dr. Oken, a board certified cardiologist. In addition, *142 the notice alleged that Dr. Oken was negligent in "misrepresenting the EKG's, failing to admit respondent to conduct a full cardiac work-up, and later recommending that respondent take Maalox when respondent called in with worsening cardiac symptoms." The notice asserted that respondent suffered a compensable injury as a result of Dr. Oken's negligence: an acute myocardial infarction.
Attached to the notice was what purported to be a statutorily required corroborating affidavit from medical expert, John D. Foster, M.D. According to the affidavit and his curriculum vitae (CV), Dr. Foster is a family physician who is board certified as both a family and emergency physician and who has:
become familiar with the appropriate work up and treatment of suspected cardiac patients in the emergency room, and the consequences of failure to timely provide appropriate work up and treatment under such circumstances.
Dr. Foster's CV shows that he was previously employed at several hospitals as an emergency room physician. Upon receipt of the notice, petitioners state they sent respondent a letter requesting respondent provide any other corroboration of the claim.
Respondent filed a formal complaint basically alleging the same facts contained in the notice. Petitioners filed a Motion of the Defendants to Dismiss Pursuant to Section 766.206, Fla. Stat., alleging that Dr. Foster's corroborating affidavit was legally insufficient to satisfy the presuit requirement outlined in section 766.102, Florida Statutes (2007). Specifically, petitioners alleged Dr. Foster was not a medical expert in the field of cardiology and, thus, was not a qualified "medical expert."
Respondent filed a supplemental affidavit by Dr. Foster indicating that he is certified by the appropriate American boards in both Family Medicine and Emergency Medicine. In his supplemental affidavit, Dr. Foster stated he had experience in two medical specialties similar to that specialty practiced by Dr. Oken, to the extent that those are specialties that include the evaluation, diagnosis, or treatment of acute chest pain and impending myocardial infarction. Pursuant to this information, the trial judge found Dr. Foster to be a qualified medical expert within the meaning of section 766.202, Florida Statutes (2007). Outside of a conclusory statement in the affidavit, there are no facts set out demonstrating how the general practice areas of family and emergency medicine are or could be a specialty similar to cardiology.
Prior to instituting a claim based on medical negligence, a claimant must comply with the presuit requirements outlined in section 766.203(2), Florida Statutes. One of these requirements is the filing of a corroborating affidavit of reasonable grounds to initiate medical negligence from a medical expert as defined in section 766.202(6), Florida Statutes.
Section 766.202(6) defines a medical expert as:
[A] person duly and regularly engaged in the practice of his or her profession who holds a health care professional degree from a university or college and who meets the requirements of an expert witness as set forth in s. 766.102.
The question before this court is whether Dr. Foster meets the qualifications as an expert witness pursuant to section 766.102. Specifically, petitioners assert that the trial court erred when it denied their motion to dismiss and concluded that respondent's expert was qualified as a medical expert under section 766.102(5), Florida Statutes, to corroborate respondent's claim.
*143 We must first determine whether this case is one that is appropriate for certiorari review.
A non-final order for which no appeal is provided by Rule 9.130 is reviewable by petition for certiorari only in limited circumstances. The order must depart from the essential requirements of law and thus cause material injury to the petitioner throughout the remainder of the proceedings below, effectively leaving no adequate remedy on appeal. Brooks v. Owens, 97 So.2d 693 (Fla. 1957); Kilgore v. Bird, 149 Fla. 570, 6 So.2d 541 (1942).
Martin-Johnson, Inc. v. Savage, 509 So.2d 1097, 1098-99 (Fla.1987) (footnotes omitted) (emphasis added). However, where a party can show the denial of an interlocutory order effectively leaves no adequate remedy on appeal, the supreme court has approved the grant of certiorari relief. See Pro-Art Dental Lab, Inc. v. V-Strategic Group, LLC, 986 So.2d 1244 (Fla.2008) (reviewing and reversing a lower court's denial of a petition for writ of certiorari which held the circuit court retained subject matter jurisdiction over a tenant landlord dispute even where the dispute was properly raised before a county court); Belair v. Drew, 770 So.2d 1164 (Fla.2000) (allowing certiorari review of a trial courts denial of a motion to dismiss alleging the grandparent visitation statute unconstitutionally infringed on parents right to privacy, finding the harm sought to be prevented could not be remedied after visitation was granted, even if temporarily); Amente v. Newman, 653 So.2d 1030 (Fla.1995) (reviewing and reversing the Fifth Districts quashing of a discovery order raised on a petition for writ of certiorari); Tucker v. Resha, 648 So.2d 1187 (Fla.1994) (holding certiorari is appropriate for interlocutory review of an order denying qualified immunity protections where harm sought to be prevented cannot be undone following appeal).
Furthermore, the supreme court has recognized the granting of certiorari relief is appropriate to implement legislatively adopted policy concerning prerequisites which must be followed prior to proceeding with certain claims.[1]See, e.g., Globe Newspaper Co. v. King, 658 So.2d 518 (Fla.1995). Specifically, the supreme court approved of the grant of certiorari relief to review an order denying a petitioners request to add punitive damages pursuant to section 768.72 in some instances, stating:
In Kraft General Foods, Inc. v. Rosenblum, 635 So.2d 106 (Fla. 4th DCA), review denied, 642 So.2d 1363 (Fla.1994) (punitive damages claim), Henn v. Sandler, 589 So.2d 1334 (Fla. 4th DCA 1991) (financial worth discovery), and Sports Products, Inc. v. Estate of Inalien, 658 So.2d 1010, (Fla. 4th DCA 1994), review dismissed, 659 So.2d 1088 (Fla.1995), the district court ruled that the procedure mandated by section 768.72 must be followed, and failure to adhere to that procedure departs from the essential requirements of the law. The plain meaning of section 768.72 now requires a plaintiff to provide the court with a reasonable evidentiary basis for punitive damages before the court may allow a claim for punitive damages to be included in a plaintiff's complaint. To allow punitive damages claims to proceed as before would render section 768.72 meaningless. Furthermore, a plenary appeal cannot restore a defendant's statutory right under section 768.72 to be free of punitive damages allegations in a *144 complaint until there is a reasonable showing by evidence in the record or proffered by the claimant. We therefore agree with the district court in Henn and Kraft and hold that appellate courts should grant certiorari in instances in which there is a demonstration by a petitioner that the procedures of section 768.72 have not been followed. We do not believe that this holding is in conflict with our decision in the Martin-Johnson case but rather is a recognition of the express requirements mandated by the statute.
Globe Newspaper Co., 658 So.2d at 519-520.
Likewise, the courts of this state have uniformly recognized the availability of certiorari review in cases where the presuit notice requirements of chapter 766 have not been met.
Certiorari jurisdiction may lie when chapter 766 presuit requirements are at issue. Pearlstein v. Malunney, 500 So.2d 585 (Fla. 2d DCA 1986); St. Mary's Hosp. v. Bell, 785 So.2d 1261, 1262 (Fla. 4th DCA 2001); Okaloosa County v. Custer, 697 So.2d 1297, 1297 (Fla. 1st DCA 1997). The statutes requiring presuit notice and screening "cannot be meaningfully enforced postjudgment because the purpose of the presuit screening is to avoid the filing of the lawsuit in the first instance." Parkway Bank, 658 So.2d at 649. In addition, interlocutory review may be necessary to promote the Medical Malpractice Reform Act's purpose of encouraging settlement. Cent. Fla. Reg'l Hosp. v. Hill, 721 So.2d 404, 405 (Fla. 5th DCA 1998).
In this case, without this court's intervention by writ of certiorari, the Personal Representative conceivably could obtain a judgment against Dr. Fassy and PMA. If, on appeal, Dr. Fassy and PMA succeed in obtaining a reversal of the judgment because the Personal Representative failed to comply with chapter 766 presuit requirements, then the appellate remedy would be inadequate to correct the error of subjecting Dr. Fassy and PMA to the very trial that presuit procedures were intended to prevent. In that event, the purposes of these cost-saving presuit procedures would be thwarted, and the appellate remedy would serve "no useful purpose." See Pearlstein, 500 So.2d at 587.
Fassy v. Crowley, 884 So.2d 359, 363 (Fla. 2d DCA 2004).
Review of interlocutory orders concerning failure to comply with the present presuit notice requirements of chapter 766 has only been denied in two circumstances. One is where the issue is actually one of general applicability, such as statute of limitations, rather than an issue specifically peculiar to medical malpractice actions. For example, in Stemerman, Lazarus, Simovitch, Billings, Finer & Ginsburg, M.D.'s P.A. v. Fuerst, 4 So.3d 55, 57 (Fla. 3d DCA 2009), the court noted:
The petitioners, however, argue that certiorari review lies here on the basis that the expiration of the statute of limitations period also constitutes a failure to comply with the pre-suit notice requirements of chapter 766, Florida Statutes. Chapter 766 requires plaintiffs in medical malpractice suits to give notice to all prospective defendants of the intent to pursue litigation. See § 766.106(2), Fla. Stat. (2008). Certiorari review is indeed appropriate when chapter 766 pre-suit requirements are at issue. See Okaloosa County v. Custer, 697 So.2d 1297 (Fla. 1st DCA 1997).
We conclude that the issue before this Court is whether the statute of limitations barred the respondents' cause of *145 action, not the failure to comply with the pre-suite notice requirements.
The other circumstance is where certiorari review is sought to review sufficiency of the evidence presented at an evidentiary hearing to determine the reasonableness of counsel's presuit investigation. St. Mary's Hosp. v. Bell, 785 So.2d 1261 (Fla. 4th DCA 2001). Our case, however, fits into neither situation. We are asked to review the trial court's legal determination concerning the sufficiency of the corroborating affidavit, which goes to the very core of the presuit notice requirement in medical malpractice actionsthat there has been a review and a determination by a physician in the same or similar specialty of the malpractice claim (more thoroughly discussed herein). Allowing a corroborating affidavit to be filed by a physician who is only a generalist rather than one in the same or similar specialty to the defendant effectively deprives a malpractice defendant of the statutorily mandated process. Filing an affidavit that is facially at odds with the statutory policy is tantamount to the filing of no affidavit. Failure to review such an affidavit would be an abrogation of our duties to enforce the statutory policy. Similar to the punitive damage presuit requirement considered in Globe Newspaper, "[s]uch [presuit] statutes cannot be meaningfully enforced postjudgment because the purpose of the presuit screening is to avoid the filing of the lawsuit in the first instance." Parkway Bank v. Fort Myers Armature Works, Inc., 658 So.2d 646, 649 (Fla. 2d DCA 1995).
In 2003, the Florida Legislature amended section 766.102 with respect to the requirements that must be possessed by an expert witness in a medical malpractice case. Ch. 2003-416, § 48, at 4086, Laws of Fla. Prior to the 2003 amendment, section 766.102(2)(b) and (c) stated in pertinent part:
(b) If the health care provider whose negligence is claimed to have created the cause of action is certified by the appropriate American board as a specialist, is trained and experienced in a medical specialty, or holds himself or herself out as a specialist, a "similar health care provider" is one who:
1. Is trained and experienced in the same specialty; and
2. Is certified by the appropriate American board in the same specialty.
. . . .
(c) The purpose of this subsection is to establish a relative standard of care for various categories and classifications of health care providers. Any health care provider may testify as an expert in any action if he or she:

1. Is a similar health care provider pursuant to paragraph (a) or (b); or

2. Is not a similar health care provider pursuant to paragraph (a) or paragraph (b) but, to the satisfaction of the court, possesses sufficient training, experience, and knowledge as a result of practice or teaching in the specialty of the defendant or practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine. Such training, experience or knowledge must be as a result of the active involvement in the practice or teaching of medicine within the 5-year period before the incident giving rise to the claim.
(Emphasis added).
After the 2003 amendment, section 766.102(5), Florida Statutes, now states in pertinent part:
A person may not give expert testimony concerning the prevailing professional standard of care unless that person is a *146 licensed health care provider and meets the following criteria:
(a) If the health care provider against whom or on whose behalf the testimony is offered is a specialist, the expert witness must:
1. Specialize in the same specialty as the health care provider against whom or on whose behalf the testimony is offered; or specialize in a similar specialty that includes the evaluation, diagnosis, or treatment of the medical condition that is the subject of the claim and have prior experience treating similar patients; and

2. Have devoted professional time during the 3 years immediately preceding the date of the occurrences that is the basis for the action to:
a. The active clinical practice of, or consulting with respect to, the same or similar specialty that includes the evaluation, diagnosis, or treatment of the medical condition that is the subject of the claim and have prior experience treating similar patients;
b. Instruction of students in an accredited health professional school or accredited residency or clinical research program in the same or similar specialty; or
c. A clinical research program that is affiliated with an accredited health professional school or accredited residency or clinical research program in the same or similar specialty.
(Emphasis added).
Prior to the 2003 amendment, any health care provider could testify as an expert and, thus, provide a presuit corroborating affidavit in any action if he or she was not a similar health care provider but, to the satisfaction of the court, possessed sufficient training, experience, and knowledge as a result of practice or teaching in the specialty of the defendant or practice or teaching in a related field of medicine. § 766.102(2)(c)(2), Fla. Stat. (2003). The effect of the 2003 amendment is that "training, experience and knowledge" in the defendant's specialty no longer render any health care provider competent to testify as an expert or to give a presuit corroborating affidavit. Rather, the expert witness must specialize in the same specialty as the defendant or specialize in a similar specialty that includes the evaluation, diagnosis, or treatment of the medical condition at issue. § 766.102(5), Fla. Stat. (2007).
In this case, petitioner Oken, "the health care provider against whom ... the testimony is offered," is a board certified cardiologist. There is no dispute that respondent's expert does not specialize in cardiology. Thus, to corroborate respondent's claim under section 766.102(5)(a)(1), Florida Statutes, respondent's expert must specialize "in a similar specialty that includes the evaluation, diagnosis, or treatment of the medical condition that is the subject of the claim and have prior experience treating similar patients."
Respondent's expert indicated that he is board certified in both emergency and family medicine. Thus, the question is whether emergency or family medicine qualifies as a "similar specialty" to cardiology.
"Similar specialty" is not defined within the statutes. Case law also provides little useful guidance. What is clear from the statutory amendment, however, is that assertions regarding experience in a particular area, standing by themselves, are insufficient absent evidence of practice in a similar specialty. This interpretation of the statutory language is consistent with the intent of requiring a presuit affidavit and with the legislative history regarding the 2003 statutory amendment.
*147 Florida courts have consistently affirmed the importance of an appropriate verified medical expert opinion as a prerequisite to file suit for medical malpractice. This court has stated:
One clear purpose of requiring corroboration is to spare all parties (not to mention the judiciary) the time and expense of litigating spurious clams. The expert opinion requirement is designed "to prevent the filing of baseless litigation... [and] to corroborate that the claim is legitimate." Stebilla [v. Mussallem], 595 So.2d [136] at 139 [(Fla. 5th DCA 1992)]. No party should be called on to defend at trial against allegations no competent witness can be found to support.

Archer v. Maddux, 645 So.2d 544, 546-47 (Fla. 1st DCA 1994) (emphasis added).
Consistent with this reasoning, it is the claimant's burden to demonstrate by facts, rather than conclusions in the affidavit, that the person executing the affidavit meets the statutory requirement. The statutory requirement for medical experts who provide presuit affidavits in medical malpractice cases was part of the comprehensive medical liability reform package. These reforms were adopted in response to a perceived crisis in Florida healthcare involving reduced quality and availability of medical care due to skyrocketing costs of medical liability insurance. The Report of the Florida House Select Committee on Medical Liability Insurance discussed the changes to the statute defining "medical expert" and the presuit process. The House Select Committee noted:
The Governor's Task Force recommended that the Legislature require experts reviewing pre-suit claims and defenses possess similar, or identical, credentials and expertise in the defendant's specialty.

J. Dudley Goodlette, Chairman, Report of House Select Committee on Medical Liability Insurance at 58 (March 2003) (emphasis added).
The pre-2003 language of section 766.102 contained a "catch-all" provision that would allow a court to admit the testimony of an expert who:
Is not a similar health care provider ... but, to the satisfaction of the court, possesses sufficient training, experience, and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine.
§ 766.102(2)(c)2., Fla. Stat. (2002).
When the Legislature altered the language of section 766.102, it replaced the phrase "similar health care provider" with the phrase "same or similar specialty" and eliminated the former "catch-all" provision. It is no longer sufficient to be a "similar health care provider" or to have "sufficient training, experience and knowledge." With the 2003 amendments, the "expert" must actively practice in the same or similar specialty.
Accordingly, the Legislature limited medical expert testimony so that only specialists would be permitted to testify against other specialists and only generalists would be able to testify against other generalists. To allow a family medicine physician, or an emergency medicine physician, to testify against a cardiologist simply because such physicians evaluate patients with suspected cardiac problems would contradict the Legislature's clear intent in revising section 766.102 and departs from the essential requirements of law.
Respondent claims that Dr. Foster is not a "generalist," as described in the petition, but is instead "a physician whose *148 specialties have been certified by two American Boards ... whose expertise is often directed to the evaluation, diagnosis or treatment of acute chest pain caused by cardiac ischemia." Dr. Foster is board certified in emergency medicine and family medicinetwo "specialties" that require broad, general knowledge of numerous areas of medicine. The American Board of Emergency Medicine (ABEM) offers certification in emergency medicine and in five subspecialties, including Hospice and Palliative Medicine, Medical Toxicology, Pediatric Emergency Medicine, Sports Medicine, and Undersea and Hyberbaric Medicine. See http://www.abem.org (find subspecialty certification link).[2] Neither *149 the general certification nor any of these subspecialty certifications, however, require any specifically focused training in cardiology. Id.
The American Board of Family Medicine (ABFM) defines family medicine as follows:
Family medicine is the medical specialty which provides continuing, comprehensive health care for the individual and family. It is a specialty in breadth that integrates the biological, clinical and behavioral sciences. The scope of family medicine encompasses all ages, both sexes, each organ system and every disease entity.

https://www.theabfm.org/about/policies/aspx (emphasis added). A family medicine physician is the classic example of a generalist.
Unlike Dr. Foster, who professes no special training in cardiology, Dr. Oken is Board Certified by the American Board of Internal Medicine (ABIM) and has additional training and certification in the specialty of cardiology. To become certified in the subspecialty of cardiovascular disease, the ABIM requires that applicants have been previously certified in internal medicine by the ABIM and: 1) complete the requisite graduate medical education fellowship training; 2) demonstrate clinical competence in the care of patients; 3) meet licensure and procedural requirements; and 4) pass the Certification Exam in Cardiovascular Disease. http://www.abim.org/certification/policies/imss/card/aspx. Certification in this specialty requires a minimum of an additional 36 months of training, with a minimum of 24 months of clinical practice, and requires that the candidates gain experience with and competence in a number of specific cardiac procedures, including electrocardiography and echocardiography. Id. Thus, Dr. Oken has completed specialized training and demonstrated a higher level of competency required to receive specialty certification in cardiology.
Among many other things, Dr. Foster's expertise as an emergency medicine physician involves and concerns the initial evaluation of patients with suspected cardiac symptoms. After the initial evaluation, an emergency medicine physician typically calls in a cardiologist with the special expertise necessary to conduct a more thorough investigation and to diagnose, treat, and manage the patient with the suspected cardiac problem. That is precisely what *150 occurred here. The alleged negligence in this case involves only the advice given after consultation by the expert who was called in to make such consultation.
A cardiologist like Dr. Oken becomes involved in an emergency room patient's care because emergency medicine physicians, like Dr. Northrop and Dr. Foster, although possessing a broad spectrum of general knowledge, lack the specifically focused education, training, and experience to provide the specialized diagnosis and treatment needed by patients suffering from cardiac complaints. If the plaintiff's claims in the Notice had concerned allegations of an improper consultation or the failure to properly consult with a cardiologist, Dr. Foster's affidavit would be relevant and appropriate. In the instant facts, it is neither.
Allowing an emergency medicine physician to comment on the specialized care provided by a cardiologist simply because an emergency medicine physician sees patients with cardiac problems in the emergency room would vitiate the public policy underlying the Legislature's 2003 amendments to chapter 766. The effect of the trial court's ruling is to elevate emergency medicine physicians (and other generalists) to the level of an expert not only in their own field of medicine but in every field and specialty. With its ruling, the trial court has altered Dr. Foster's status as a "generalist" and made him a "specialist" in all areas of medicine he encounters in the emergency room. If emergency medicine physicians are allowed to testify to the standard of care for the specialized treatment of any type of complaint typically seen in the emergency room (e.g., headache, abdominal pain, shortness of breath), emergency medicine physicians will be qualified to testify as to virtually every specialty (e.g., neurology, gastroenterology, pulmonology). Family medicine and internal medicine physicians, likewise, would be qualified to comment on the standard of care of all specialists. This is neither what the law now permits nor what the Legislature intended.[3]
We grant the petition. The decision of the trial court denying the motion to dismiss is quashed.
BENTON, J., concurs; BROWNING, J., dissents with separate opinion.
BROWNING, J., dissents.
Because the majority opinion transgresses binding precedent of this Court and ignores persuasive non-binding, out-of-state precedent by relying on Internet information not contained in the case record and unknown to the parties; fails to follow relevant procedural precedent of substantial persuasive value; and injects the judiciary into adversarial territory heretofore untraveled, I am compelled to dissent.

Analysis of Majority Opinion

General Comments
I do not take issue with the majority opinion's assertion about the public policy behind the intent of section 766.102, Florida Statutes (2007). But as stated later in this dissent, I do take issue with using these changes to justify a "rush to judgment" at the pleading stage of a medical malpractice action. The statutory changes were enacted for implementation under our traditional adversarial system. Medical personnel were granted rights by the statutory changes, and not immunity from going through adversarial testing. The crux of why I am dissenting is found in the *151 majority opinion's recitation of certification criteria for cardiology. Great detail is advanced about the requirements for a specialty in cardiology. Yet, these requirements were never presented to the trial judge, and they cannot be found in Dr. Foster's affidavit, only in the majority opinion. The trial judge will become acquainted with this non-record factual evidence when he reads the majority opinion. This is not how our system should operate. This information should have been lifted from the Internet sites referenced and presented by Petitioners at a hearing before the trial judge in conformity with the rules of evidence, and not injected at the appellate level for discovery by the trial judge after remand.

Procedural Deficiencies
Because we review an order entered on a motion to dismiss, there is procedural precedent that should be applied, and if applied, would require dismissal of the petition. A trial judge, when ruling on a motion to dismiss, is required to take as admitted all allegations of the document (here an unrefuted affidavit) subject to the motion to dismiss. Rudloe v. Karl, 899 So.2d 1161 (Fla. 1st DCA 2005); Todd v. Johnson, 965 So.2d 255 (Fla. 1st DCA 2007). The trial judge applied this principle when denying Petitioners' motion to dismiss and reached the right result, which should not be disturbed.
Also, as we are exercising certiorari review, to prevail, Petitioners must show that the trial judge deviated from the essential requirements of law, which will cause irreparable harm and injury that cannot be remedied on final appeal. See Reeves v. Fleetwood Homes of Fla., Inc., 889 So.2d 812 (Fla.2004); Royal Marble, Inc. v. Innovative Flooring Stonecrafters of SWF, Inc., 932 So.2d 221 (Fla. 2nd DCA 2005). That test is not met here. If we uphold the trial judge and dismiss the petition, we cannot predict whether the trial judge will make the same ruling after an evidentiary hearing on the issue following remand. This circumstance falls far short of irreparable harm or injury as required by precedent. Accordingly, I would dismiss the petition for this reason, if no other, at this juncture. Of course, on remand this issue will still support a dismissal of the action if shown by record evidence presently lacking.
While the foregoing general certiorari principle supports the petition's dismissal, more importantly, specific case law compels a dismissal as well. In St. Mary's, 785 So.2d at 1262, our sister court pointed out the correct parameters of certiorari review in medical malpractice actions as follows:
Certiorari may lie from orders denying motions to dismiss for failure to comply with the presuit requirements of chapter 766 in medical malpractice actions. See, e.g., Citron v. Shell, 689 So.2d 1288, 1290 (Fla. 4th DCA 1997), disapproved on other grounds, Cohen v. Dauphinee, 739 So.2d 68 (Fla.1999); Cent. Fla. Reg'l Hosp. v. Hill, 721 So.2d 404, 405 (Fla. 5th DCA 1998). However, certiorari does not lie for appellate courts to reweigh the evidence presented concerning compliance with the presuit statutory requirements.

(emphasis added). Here, there is no doubt that Appellee complied with the presuit requirements of chapter 766; not one step was omitted. However, the majority opinion does not stop there; it pursues the impermissible reweighing of the evidence presented concerning statutory compliance, a clear conflict with and disregarding of St. Mary's.
Even more significantly, another panel of this court refused to follow the "drift" of the majority opinion's reasoning and denied certiorari relief in a chapter 766 action. *152 See Abbey v. Patrick, 16 So.3d 1051 (Fla. 1st DCA 2009). Abbey involves denial of certiorari review of a statute of limitations issue under chapter 766 that the majority opinion tries to distinguish as appropriate there, but inappropriate here, by stating: "where the issue is actually one of general applicability, such as a statute of limitations, rather than an issue specifically peculiar to medical malpractice actions." This statement is unsupportable. These cases involve whether or not the statute of limitations was tolled under chapter 766.106(4), a provision relating to medical malpractice actions and no other civil actions. Moreover, a statute of limitations issue is more susceptible to traditional certiorari review than here, where evidence injected by the majority is being weighed, and a factual determination made on an expert's qualification. Simply put, there is no logical way the majority opinion can be reconciled on this point with Abbey. In my opinion, the majority's disposition here directly conflicts with Abbey and will leave attorneys and trial judges perplexed.
Notwithstanding these procedural deficiencies, which should be dispositive, there are substantive reasons that impel the same result.

Substantive Deficiencies
A correct determination of this petition depends upon whether Respondent's expert, Dr. Foster, specializes in a similar specialty as Dr. Oken and has extensive related experience in the field under review as specified by section 766.102(5)(a)1.-2.a., Florida Statutes (2007).
Dr. Foster, by sworn affidavit, stated he met all of the required criteria. Significantly, Petitioners did not refute Dr. Foster's factual allegations, but elected to file a motion to dismiss containing only the unsworn non-expert assertions of their counsel. The Legislature has not defined "similar specialty," but the majority opinion, relying upon Internet information not contained in the record as its only factual basis, makes a factual determination that Dr. Foster is not engaged in a similar specialty and is not qualified to testify and meet pre-suit requirements under section 766.102(5)(a), Florida Statutes (2007). This approach is without legal support at this stage of the proceeding. The trial judge properly ignored personal use of the Internet and ruled on the basis of the admitted factual allegations in Dr. Foster's affidavit, and the majority should accept that determination rather than make its de novo determination.
Moreover, the use of non-record Internet information violates binding precedent of this court. See Whitley v. State, 1 So.3d 414 (Fla. 1st DCA 2009) (Department of Corrections' website printout stating when defendant was released from prison declared inadmissible hearsay, necessitating reversal and remand for resentencing). Although Whitley is a criminal case, there is no reason why it is not binding here. Despite Whitley's admonition, the majority opinion references three Internet citations to support its fact-based determination contrary to that of the trial judge and Dr. Foster's affidavit. These citations relate to Internet information that goes to the very heart of this appeal: whether Dr. Foster is qualified to testify as a specialist in a similar specialty to Dr. Oken's specialty. Accordingly, such Internet citations provide the very information (omitted by Petitioners) that is necessary correctly to determine this appeal and should be disallowed.
Significantly, there is out-of-state authority that reaches the same result as Whitley, but on a far more fundamental and far-reaching basis. In N.Y.C. Medical & Neurodiagnostic, P.C. v. Republic Western Insurance Company, 8 Misc.3d 33, 798 *153 N.Y.S.2d 309 (N.Y.App.Div.2004), which reflects my personal view, the court stated:
In conducting its own independent factual research, the [lower] court improperly went outside the record in order to arrive at its conclusions, and deprived the parties an opportunity to respond to its factual findings. In effect, it usurped the role of counsel and went beyond its judicial mandate of impartiality.

Id. at 313 (emphasis added).
Although N.Y.C. Medical & Neurodiagnostic involves an appeal from a trial judge who utilized non-record Internet information to determine a case, there is no reason the same result does not apply to appellate courts. In fact, there exists a far more compelling reason for appellate courts to follow such reasoning: appellate courts are confined to the record compiled below and have no part in a record's composition.
Moreover, the unsoundness of Internet information usage in similar situations has not gone unnoticed by legal scholars and professional associations that help shape American law. This very subject was addressed in a respected legal periodical, which in pertinent part states:
Are Judges prohibited under canons of judicial conduct from independently accessing the Internet? Not expressly. The Code of Conduct for United States Judges does not address Internet searches by judges, and neither does the American Bar Association's Model Code of Judicial Conduct, which has been adopted by New York. The Model Code does, however, contain a relevant comment in Canon 3 ("A judge shall perform the duties of judicial office impartially and diligently"). The commentary to that canon states, "A judge must not independently investigate facts in a case and must consider only the evidence presented."
* * *
The ABA Joint Commission to Evaluate the Model Code of Judicial Conduct has recently proposed a revision to the Model Code that more specifically restricts judges from accessing the Internet. The Commission's 2004 draft of the Model Code states within its rule 2.09 that "a judge shall not independently investigate facts in a case." The commentary to that rule provides as follows: "The prohibition against a judge investigating the facts of a case independently or through a member of the judge's staff extends to information available in all mediums including electronic access." The Association of the Bar of the City of New York Committee on Professional and Judicial Ethics and Committee on Government Ethics jointly responded positively to the Joint Commission's draft: "Because facts obtained on the Internet and in other electronic media are often incomplete or incorrect, we support this important principle.
David H. Tennant & Laurie M. Seal, "Judicial Ethics and the Internet: May Judges Search the Internet in Evaluating and Deciding a Case?" 16 Professional Lawyer 2, 16 (2005).
Finally, in my view, Internet research is flawed for other reasons as well. Because some judges and staff members are more adroit in Internet use than others, even if we assume complete neutrality, which generally is very difficult in such situations, what checks exist on the proficiency or objectivity of the judiciary's use of the Internet free of the restraints of our adversary system? The answer is self-evident: There is no check, and judicial use of the Internet to compile non-record evidence in an appeal should be prohibited until authorized and regulated by the evidence code. The record should contain only evidence that has been tested in our *154 adversarial process, and not by unsupervised judges and staffs.

Footnote 1 of Majority Opinion
After reviewing the foregoing part of this dissent, the majority opinion amended its opinion by a footnote 1 as a rebuttal to my Internet comments. After stating that the majority opinion would remain the same regardless of its Internet usage, the majority cites many cases to support the use of Internet information here. From this effort, I can only assume the majority opinion is asserting that it is perfectly all right to use Internet information in a case, provided it is judicially sanctioned. What the majority opinion fails to address is that a court's use of Internet information, divorced from the parties' input through the adversarial process, is error.
This error is illuminated by the very cases the majority opinion cites in support of Internet usage. All of the cases are decisions that involved evidentiary hearings or undisputed factual issues that produced record evidence compiled by the parties, and not judges as here. See Perkovich (appeal from final judgment of dissolution of marriage); Gonzalez (appeal from final summary judgment); Rogers (appeal from murder conviction); Ward (appeal from denial of writ of prohibition to stop involuntary commitment proceedings under Jimmy Ryce Act); Strand (appeal from final judgment validating proposed bond issue); Williams (appeal from final summary judgment); Green (appeal from final judgment of restitution); Hollowell (appeal from a motion to dismiss decided on insufficient jurisdictional allegations contained within the four corners of the complaint and Internet citations relating to a case citation from the United States Supreme Court official docket and a news article not at issue); Certification (non-adversarial original proceeding on the need for additional judges); E.A.R. (appealed from juvenile sentence departure); Webster (appeal from a judgment denying admission to The Florida Bar after an evidentiary hearing); Browning (appeal from an order granting class certification following a full evidentiary hearing); Griem (appeal from final summary judgment); Bortell (appeal from final judgment of dismissal. Opinion cites a dictionary Internet cite that gives a definition of the word "party") Kitchens (appeal from final order modifying alimony); Peterson (writ of prohibition to review denial of motion to dismiss based on statutory immunity Internet citation to Wikipedia, which established that section 776.013, Florida Statutes, is popularly known as the "Stand your Ground Law." Whether this was in fact the popular nickname for section 776.013 apparently was not in dispute, and whether its usage was stipulated to by the parties cannot be discerned.); and Graham (appeal from a final life sentence without parole).
An examination of the foregoing cases reveals why the majority opinion contains the statement: "First, it should be noted that the result would not have been any different without the Internet citations." Ante p. 148 n. 2. This is indeed a correct statement because all the cases cited concern appellate review after evidentiary hearings, or relate to issues not in dispute, and cannot support a correct decision here. None of them remotely addresses judicially injected facts that decide a controlling issue in a case, as does the majority opinion here. Moreover, many of the cases do not reveal the evidentiary nuances that led to the Internet citations' being used, such as the existence of a stipulation authorizing its admissibility by the parties or reflecting undisputed fact. Because we are concerned here with an appeal of a denial of a motion to dismiss, these cases actually support the position of this dissent, and *155 the majority opinion has been "hoist on its own petard."
Significantly, no rule of evidence permits the admission of Internet information as evidence, absent a party's stipulation. Section 90.706, Florida Statutes (2007), the evidence rule that is most analogous to Internet information as evidence, prohibits the use of a learned treatise as substantive evidence. See Green v. Goldberg, 630 So.2d 606 (Fla. 4th DCA 1993). This rule was applied in Green, a medical malpractice case, wherein the court opined by a statement applicable here as follows:
Under section 90.706, Florida Statutes (1991), authoritative publications can only be used during the cross-examination of an expert and not to bolster the credibility of an expert or to supplement an opinion of the doctor which has already been formed. Chorzelewski v. Drucker, 546 So.2d 1118 (Fla. 4th DCA 1989); Tallahassee Memorial Regional Medical Center v. Mitchell, 407 So.2d 601 (Fla. 1st DCA 1981). Section 90.706 does not allow statements in a learned treatise to be used as substantive evidence since the treatise is hearsay if it is offered as substantive evidence.

Green, 630 So.2d at 609. (emphasis added).
Because there is no evidence rule that specifically authorizes substantive use of Internet information, and section 90.706 prohibits the use of a learned treatise as substantive evidence, I am perplexed why the majority opinion advances what appears, at least by implication, to be a defense of the inadmissible use of Internet information as substantive evidence.
In opposition to the clear precedential relevance of Green and section 90.706, the majority opinion relies upon a factually unrelated case, Weeks, 977 So.2d at 616. Weeks concerned a claim under Florida's Neurological Injury Compensation Act (NICA) and a final review appeal from a final decision of the Birth-Related Neurological Injury Compensation Association. See id. Once again, that case concerns a final appeal from an evidentiary hearing, and the court there opined that the facts were "undisputed." I cannot comprehend how this case can possibly supply a precedential basis for the majority opinion, as the information alluded to from the Internet citation could not have been admitted without a stipulation of the parties, or else the phrase "undisputed facts" would not have appeared in the opinion. See Green; § 90.706, Fla. Stat. (2007). Yet, the majority opinion denies Respondent's right to an evidentiary hearing here, but Weeks does not justify that denial.
Finally, somewhat puzzling to me, the majority opinion attempts to place the blame for its inappropriate Internet usage on Appellee. The majority opinion points out that Respondent in this court "neither moved to strike nor raised any objections to the use of the citation." I find no purpose in such a "deflective disclaimer." This is an appellate court, not a trial court where the Rules of Civil Procedure prevail. There is no appellate requirement that a motion to strike or objection be made to inappropriate non-record matter or suffer the penalty that facts and issues will be deemed admitted. Moreover, I do not think it unreasonable for a party to comfortably rely on an appellate court confining its determination to the record, and not requiring a party to save it from impermissible transgressions.
For these reasons, I would dismiss the petition and remand for further proceedings to include an evidentiary hearing or other means to augment the record. As the majority opinion conflicts with St. Mary's, I would certify the conflict for further review. Accordingly, I dissent.
NOTES
[1] In a slightly different context, we recently approved of the use of another common law writ to enforce legislatively mandated pretrial procedures. See Hair v. State, 17 So.3d 804 (Fla. 1st DCA 2009).
[2] This footnote addresses the dissent's general attack on the use of internet citations and research. First, it should be noted that the result would not have been any different without the internet citations.

No one can argue that indiscriminate, independent internet research by a judge involving subjective facts, non-legal opinions and studies, or the use of unknown or unverified websites not presented by the parties would create significant concerns. The use of generally-known knowledge, however, which is capable of accurate and ready determination from sources whose accuracy cannot reasonably be questioned, does not present the same concerns. Elizabeth G. Thornburg, The Curious Appellate Judge: Ethical Limits on Independent Research, 28 Rev. Litig. 131 (Fall 2008). This is especially true when the source has been cited by one of the parties and there has been no objection or motion to strike by the opposing party.
In the instant case, petitioners, in their reply, presented the citations in question. The citations were from the official websites of the American Board of Emergency Medicine, the American Board of Family Medicine, and the American Board of Internal Medicine sources whose accuracy cannot be reasonably questioned and the very sources that Dr. Foster claims he received his certification from. The contested research only involved generally the areas of practice included in a particular specialty. These are the types of facts that are (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. These qualifications are the standard for judicial notice both under section 201 of the Federal Rules of Evidence and section 90.202, Florida Statutes (2008); thus, the use of this type of factual internet research should not be the subject of controversy. See Thornburg, supra at 157-8. In addition, respondent neither moved to strike nor raised any objection to the use of the citations.
Many Florida appellate courts have taken judicial notice of internet materials that cannot be reasonably questioned to support their arguments and, thus, contrary to the dissent's assertions, this court's reliance on the underlying materials does not violate binding precedent. Recently, on judge on the Fifth District used a medical website to look at the normal procedures in a particular case.
The fallacy of this argument becomes readily apparent when consideration is given to the fact that one of the first things an obstetrician does is to determine the delivery date in order to establish a care regimen and protocol for the patient and set future examination dates. See The Merck Manual of Diagnosis and Therapy 1744-59 (Robert Berkow, M.D., et al. eds., 15th ed. 1987); see also The Merck Manuals Online Medical Library § 22 (Robert S. Porter, M.D., et al. eds., 2003), available at http://www.merck.com/mmhe/sec22/ch257/ch257b.html.
Weeks v. Fla. Birth-Related Neurological, 977 So.2d 616, 630 (Fla. 5th DCA 2008) (Sawaya, J., concurring).
Similar factual determinations were made with references to internet sites in Perkovich v. Humphrey-Perkovich, 2 So.3d 348, 350 (Fla. 2d DCA 2008) (citing WebMD to define a benign essential tumor); Gonzalez v. Tracy, 994 So.2d 402 (Fla. 3d DCA 2008) (using an online medical encyclopedia in note 1 to define plantar fasciitis); see also Rogers v. State, 957 So.2d 538, 551 n. 15 (citing a United States Department of Justice website to establish that an investigative report describing poor laboratory conditions at the FBI crime lab was released in 1997); Ward v. State, 986 So.2d 479, 490 (Fla.2008) (Anstead, J., dissenting) (citing the Florida Senate website to establish legislative intent); Strand v. Escambia County, 992 So.2d 150, 160 (Fla.2008) (citing Florida Constitution Revision Commission's website to support assertion that no proposed revisions affected the application of binding caselaw); Williams v. Davis, 974 So.2d 1052, 1064 n. 13 (Fla.2007) (Cantero, J., concurring) (citing a Leon County Public Works website to identify the importance of canopy roads in Florida); Green v. State, 998 So.2d 1149, 1150 n. 4 (Fla. 2d DCA 2008) (Altenbernd, J., concurring) (citing the Florida Department of Corrections website's estimate of approximately $50 a day to house, feed, clothe, educate, and provide medical expenses to an inmate at a major prison); Hollowell v. Tamburro, 991 So.2d 1022, 1024 n. 1 (Fla. 4th DCA 2008) (citing news article explaining local attorney was arrested on charges of fraud to explain delay in parties' actions).
To demonstrate how well accepted internet citation has become, numerous cases have utilized internet citation since the first of this year. The Florida Supreme Court utilized internet citations in at least five cases, including: In Re Certification of Need for Additional Judges, 3 So.3d 1177 (Fla.2009); E.A.R. v. State, 4 So.3d 614 (Fla.2009); Florida Board of Bar Examiners re Webster, 3 So.3d 1058 (Fla.2009). The Third District used them in at least two cases: Browning v. Angelfish Swim School, Inc., 1 So.3d 355 (Fla. 3d DCA 2009); Griem v. Becker, 4 So.3d 721 (Fla. 3d DCA 2009). The Fourth District used them in at least two cases: Bortell v. White Mountains Ins. Group, Ltd., 2 So.3d 1041 (Fla. 4th DCA 2009); Kitchens v. Kitchens, 4 So.3d 1 (Fla. 4th DCA 2009). Indeed, this court has utilized internet citations in two recent cases. See Peterson v. State, 983 So.2d 27, 29 (Fla. 1st DCA 2008); Graham v. State, 982 So.2d 43, 49 (Fla. 1st DCA 2008).
[3] While one may quarrel with the wisdom of the law, it is not the job of this court to explore the wisdom of this policy.